## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **U.S. Securities and Exchange Commission**<br>100 F Street, N.E.<br>Washington, DC 20549-0911<br><br><br>Movant,<br><br>-v.-<br><br>**Deloitte Touche Tohmatsu CPA Ltd.**<br>30/F Bund Center<br>222 Yan An Road East<br>Shanghai 200002, PRC<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MISC. No. _____

### DECLARATION OF LISA DEITCH PURSUANT TO 28 U.S.C. § 1746

1.      My name is Lisa Deitch.  I am over the age of eighteen (18) years and have never been

convicted of a felony or crime involving moral turpitude.  I have knowledge of the facts

set forth below based on my personal involvement in the instant investigation, my review

of public records of the companies involved, and my review of filings with the United

States Securities and Exchange Commission ("SEC" or "Commission").

2.      I am employed as an attorney and Assistant Director with the Division of Enforcement of

the SEC in Washington, D.C.

3.      On May 25, 2011, the Commission issued an Order Directing Private Investigation and

Designating Officers to Take Testimony in a matter entitled *In the Matter of Longtop*

*Financial Technologies Limited,* SEC File No. HO-11698 (the "Formal Order").  The

Formal Order, a copy of which is attached as Exhibit A, authorizes members of the SEC

staff (the "Staff") to investigate, among other things, whether antifraud provisions of the federal securities laws have been or are being violated by any persons or entities in connection with the offer, sale and/or purchase of securities in Longtop Financial Technologies Limited ("Longtop"). The Formal Order also authorizes the Staff to determine whether any persons or entities have engaged "in any acts or practices of similar purport or object." Exhibit A, Section III (2nd paragraph).

4.      Pursuant to Section 19(c) of the Securities Act of 1933 and Section 21(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), the Formal Order designates me and certain other members of the Commission's Staff (including Helaine Schwartz, a Senior Counsel in the Division of Enforcement who issued the Subpoena in this matter) as officers for the purpose of the investigation.

The Longtop Investigation

5.      Longtop is a Cayman Islands corporation with principal offices in Hong Kong and Xiamen, China. Longtop is a foreign private issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78(l)]. Longtop's American depositary shares ("ADSs") have been listed on the New York Stock Exchange ("NYSE") under the symbol LFT. Longtop files annual reports and furnishes other reports, including on Form 20-F and Form 6-K, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

6.      Deloitte Touche Tohmatsu CPA Ltd. ("D&T Shanghai") was Longtop's auditor from at least 2007 until D&T Shanghai resigned on May 22, 2011. In that capacity, D&T Shanghai prepared and issued audit reports filed by Longtop with the Commisison. As explained further below, D&T Shanghai is a Chinese member firm of Deloitte Touche

Tohmatsu Limited, a UK private company.  Since 2004, D&T Shanghai has been registered in the United States as a public accounting firm with the Public Company Accounting Oversight Board (the "PCAOB").

7.    In 2007, Longtop raised approximately $210 million in an initial public offering of its ADSs in the United States, which was underwritten by Goldman Sachs Group, Inc. and Deutsche Bank AG.  Longtop raised an additional $115 million in a subsequent United States offering of its ADSs in 2009.  In connection with each of these offerings, D&T Shanghai consented to the use of its audit reports on Longtop's financial statements in Longtop's registration statements (including on forms F-1 and F-3) filed with the SEC.

8.    Each year from at least 2007, D&T Shanghai provided audit reports relating to Longtop's consolidated financial statements, which were filed with the Commission along with Longtop's annual reports.  As part of its audit procedures, D&T Shanghai audited the financial statements of Longtop and its subsidiaries, including Longtop Financial Technologies USA Limited, a subsidiary that was incorporated in the United States.

9.    For the fiscal year ended March 31, 2010, Longtop reported total revenue of $169 million and net income of $59 million.  In connection with that fiscal year, D&T Shanghai issued an audit report dated July 16, 2010, expressing an unqualified opinion on Longtop's consolidated financial statements.  In particular, D&T Shanghai wrote that

> [Longtop's] consolidated financial statements present fairly, in all material respects, the financial position of Longtop Financial Technologies Limited and subsidiaries as of March 31, 2009 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2010, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

10.   On May 17, 2011, trading in Longtop's ADSs was halted by the NYSE.  At the time

trading was halted, Longtop's ADSs were priced at $18.93 per share with 57 million

shares outstanding, resulting in a market capitalization of approximately $1.08 billion.

11.   On May 23, 2011, Longtop furnished a report on Form 6-K announcing that D&T

Shanghai had resigned as its auditor and attaching D&T Shanghai's letter of resignation.

In the same Form 6-K, Longtop announced that Derek Palaschuk, Longtop's Chief

Financial Officer, tendered his resignation by letter, dated May 19, 2011.[1]

12.   In D&T Shanghai's letter of resignation, a copy of which is attached hereto as Exhibit B,

D&T Shanghai explained that it was resigning because, among other things:

   a.   As part of its year-end audit for the year ended March 31, 2011, D&T Shanghai

   had sought to visit certain of Longtop's banks to follow up on confirmations D&T

   Shanghai had received.  This process identified "a number of very serious defects

   including: statements by bank staff that their bank had no record of certain

   transactions; confirmation replies previously received were said to be false;

   significant differences in deposit balances reported by the bank staff compared

   with the amounts identified in previously received confirmations (and in the

   books and records of [Longtop]); and significant bank borrowings reported by

   bank staff not identified in previously received confirmations (and not recorded in

   the books and records of [Longtop])." Exhibit B.

   b.   D&T Shanghai initiated a second round of bank confirmations on May 17, 2011,

   but the process was stopped as a result of intervention by Longtop's officials,

   including its Chief Operating Officer.  Longtop called banks and asserted that

---

[1] Longtop announced that it formally accepted Mr. Palaschuk's resignation on June 1, 2011.

D&T Shanghai was no longer its auditor, and Longtop officials seized

documentation from D&T Shanghai, including certain of its work papers.

c.  On May 20, 2011, Longtop's Chairman admitted to a D&T Shanghai audit partner

that "there [was] fake revenue in the past so there [was] fake cash recorded on the

books." Exhibit B.  When asked who was involved, the Chairman answered,

"senior management." *Id.*

13.  In its May 19, 2011 resignation letter, D&T Shanghai summarized its reasons for

resigning by writing:  "The reasons for our resignation include: 1) the recently identified

falsity of [Longtop]'s financial records in relation to cash at bank and loan balances (and

also now seemingly in the sales revenue); 2) the deliberate interference by the

management in our audit process; and 3) the unlawful detention of our audit files. These

recent developments undermine our ability to rely on the representations of the

management which is an essential element of the audit process; hence our resignation."

Exhibit B.  It further wrote that:  "We have reached the conclusion that we are no longer

able to place reliance on management representations in relation to prior period financial

reports. Accordingly, we request that [Longtop] take immediate steps to make the

necessary 8-K filing to state that continuing reliance should no longer be placed on our

audit reports on the previous financial statements and moreover that we decline to be

associated with any of [Longtop]'s financial communications during 2010 and 2011." *Id.*

14.  In its May 23, 2011 Form 6-K, Longtop stated that its audit committee had retained

United States counsel and was commencing an internal investigation; however, on or

about July 1, 2011, the Staff was informed by the audit committee's counsel that each

and every member of Longtop's audit committee had resigned and that no internal investigation would be conducted.

15.     The Staff served an administrative subpoena requesting certain documents on Longtop (via its registered agent for service of process in the U.S.) on May 27, 2011.  On or about June 3, 2011, the Staff was informed that Longtop had retained U.S. counsel to represent it and conduct an internal investigation.  However, on or about June 21, 2011, Longtop's U.S. counsel informed the Staff that it was resigning, after producing minimal documents on Longtop's behalf.  While the Staff has recently been informed that Longtop has retained new U.S. counsel, it has not produced any further documents to the Commission; Longtop has similarly refused to make its employees or officers available to the Commission for questioning.

16.     On July 19, 2011, the NYSE notified Longtop of its intent to start the process of delisting Longtop's securities.  On August 17, 2011, NYSE filed a Form 25, Notification of Removal From Listing and/or Registration Under Section 12(b) of the Securities Exchange Act of 1934, as to Longtop.

Service of Subpoena on D&T Shanghai

17.     As part of the *Longtop* investigation, the SEC Staff served an administrative subpoena (the "Subpoena") on D&T Shanghai's prior U.S. counsel, Douglas Cox, of Gibson Dunn LLP, on May 27, 2011.  On May 23, 2011, Mr. Cox had confirmed to the Staff that he was authorized and willing to accept service of the Subpoena on D&T Shanghai's behalf. Accordingly, this constituted proper and valid service of process on D&T Shanghai. Indeed, D&T Shanghai has not contested the service or the validity of the Subpoena.

18.     In the Subpoena, the SEC Staff requested that D&T Shanghai, through its custodian of

        records, produce documents, from between January 1, 2007, and the date of the

        Subpoena, related to D&T Shanghai's business and, in particular, its activities as

        Longtop's auditor.  *See* Exhibit C.  The Subpoena required responsive documents to be

        produced to the Staff in Washington, D.C. by June 10, 2011.

19.     On June 9, 2011, the Staff granted D&T Shanghai a one-week extension, until June 17,

        2011, to respond to the Subpoena.

20.     On June 15, 2011, the Staff was contacted by new legal counsel for D&T Shanghai,

        Michael Warden of Sidley Austin LLP, who requested that the Staff further extend the

        return date of the Subpoena.  After additional communication with D&T Shanghai's

        counsel, the Staff agreed to extend further the return date of the Subpoena until July 8,

        2011.

21.     To date, D&T Shanghai has failed to comply with the Subpoena in every respect.

22.     On July 8, 2011, in lieu of producing the required documents, counsel for D&T Shanghai

        submitted a letter to the Staff indicating that it was refusing to comply with the Subpoena

        because, among other things, it believed doing so may subject it to sanctions under

        Chinese law.

23.     More specifically, in its July 8, 2011 letter, a copy of which is attached hereto as Exhibit

        D, counsel for D&T Shanghai:

a.  Acknowledged that D&T Shanghai possesses vast amounts of materials that are responsive to the Subpoena, including at least 1,700 pages of hard copy documents and 876 megabytes of electronic data.[2]

b.  Asserted that State Secrets, Archives and CPA laws of the People's Republic of China *may* prevent the production of any and all responsive documents to the SEC, without identifying the specific prohibitions that applied to particular documents.

c.  Stated that D&T Shanghai had sought the consent of the China Securities Regulatory Commission ("CSRC") to produce certain responsive documents to the SEC in this matter, but that the CSRC did not consent and instead directed D&T Shanghai to seek approval from other Chinese government agencies, such as the Ministry of Finance, the States Secrets Bureau and the State Archives Bureau;

d.  Stated that D&T Shanghai had sought the consent of the Ministry of Finance, the States Secrets Bureau and the State Archives Bureau to produce certain responsive documents to the SEC, but that those agencies had not yet given their approval for the production of any documents; and

---

[2] Notwithstanding the fact that the Subpoena called for any and all documents from between January 1, 2007, and the date of the Subpoena, counsel for D&T Shanghai advised that it would object to the production of any documents dated prior to July 21, 2010. D&T Shanghai's counsel claimed that the SEC was not entitled to any of the requested documents to the extent they were created prior to the effective date of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), P.L. 111-2003 (July 21, 2010). In fact, the SEC's authority to issue subpoenas, including the one which is the subject of this lawsuit, is entirely independent of the Dodd-Frank Act. In any event, considering that D&T has served as Longtop's independent auditor since at least 2007, this tally of responsive documents (which, according to D&T Shanghai's counsel includes only documents prepared after July 21, 2010) is almost assuredly a small fraction of the full set of responsive documents.

    e.  Asserted that unless and until it received approval from each of the various regulatory agencies in China, D&T Shanghai would not produce any responsive documents to the SEC.

24.    Counsel for D&T Shanghai has refused to represent to the Staff that its client will comply with the Subpoena at some future date. Instead, D&T Shanghai has proposed to produce responsive documents to regulatory agencies in China, with the proposal that the Staff seek to obtain the documents from those agencies. Given the lack of any assurance that the Staff would be able to obtain such documents from those agencies, let alone in a timely fashion, the Staff has refused to accept this proposal, which falls far short of what is required of D&T Shanghai under U.S. law.

25.    Thus, the Staff has found no reason to grant any further extensions of the Subpoena's return date.[3]

26.    The documents sought by the Commission from D&T Shanghai by the Subpoena are highly relevant to the Commission's *Longtop* investigation. Not only do they pertain to the issues identified in the Formal Order; the SEC Staff believes the records called for by the Subpoena will assist in establishing the extent of any fraud at Longtop, who was behind any such fraud, how significant it was, and how it was conducted. In addition,

---

[3] On September 2, 2011, the Commission separately issued a formal request to D&T Shanghai, pursuant to Section 106 of the Sarbanes-Oxley Act, 15 U.S.C. § 7216 ("Section 106"), as amended by § 929J of the Dodd-Frank Act, to produce a subset of those documents sought by the subpoena, namely, all audit work papers and all other documents related to any audit reports issued, audit work performed, or interim reviews conducted for Longtop from January 1, 2007 to the present. The Commission first issued this request to D&T Shanghai's counsel, which refused to accept service of the request – purportedly because the Commission was unwilling to permit D&T Shanghai to satisfy its Section 106 obligations by the alternative means of producing documents to a Chinese regulator. Accordingly, the Commission has also issued this request to D&T Shanghai's registered agent for service of Section 106 requests.

because the Commission has been able to obtain minimal documents from Longtop

directly, obtaining the documents under Subpoena from D&T Shanghai is particularly

critical.

D&T Shanghai Routinely Conducts Business in the United States

27.     According to public documents that Longtop has filed with the Commission, Longtop has

paid D&T Shanghai over $4 million for audit and audit related services since 2006.

Specifically, Longtop paid D&T Shanghai $720,000 for such services in calendar year

2006; $220,000 for the three months ended March 31, 2007; $571,000 for the twelve

months ended March 31, 2008; $1.258 million for the twelve months ended March 31,

2009; and $1.305 million for the twelve months ended March 31, 2010.  Because

Longtop has not yet filed an annual report for the twelve months ended March 31, 2011,

it is unclear how much D&T Shanghai was paid by Longtop for audit and audit related

services it conducted for that period prior to its resignation.

28.     However, in connection with the Longtop investigation, the Staff has learned that D&T

Shanghai routinely conducts business in the United States, above and beyond its

relationship with Longtop.

29.     According to its most recent annual report filed with the PCAOB on June 30, 2011,

during the twelve month period ended March 31, 2011, D&T Shanghai issued audit

reports for 45 separate United States registrants.  Indeed, according to the same report,

approximately 15% of D&T Shanghai's total fees were fees paid to it by United States

registrant clients and approximately 12% of D&T Shanghai's total fees were for audit

services provided by D&T Shanghai to United States registrant clients.

30.     Part of D&T Shanghai's ability to conduct business in the United States has been the

result of its relationship with the UK firm Deloitte Touche Tohmatsu Limited (DTTL). In

its registration filings with the PCAOB, D&T Shanghai has explained its relationship

with DTTL as follows:

> The Deloitte Network is an association of legally separate, independent firms that
> are members of Deloitte Touche Tohmatsu Limited (DTTL), a UK private
> company limited by guarantee.  To facilitate high quality professional conduct &
> service, DTTL has adopted policies & protocols regarding professional standards,
> methodologies & systems for quality control & risk management.  DTTL member
> firms (MFs) provide professional services in specific geographic areas and as
> appropriate may request assistance from MFs in other countries.  DTTL does not
> provide services to clients nor control or own any interest in any MF.  MF's,
> locally-formed entities with their own ownership structure, have become members
> of DTTL to coordinate their approach to client service, professional standards,
> shared values, methodologies, systems of quality control & risk management.

31.     D&T Shanghai is also a member of DTTL's Chinese Services Group.  DTTL's website

explains as follows:

> Deloitte's Chinese Services Group (CSG) coordinates with the Deloitte Touche
> Tohmatsu member firm in China and the appropriate subsidiary of Deloitte LLP
> to assist U.S. companies investing and operating in China. Whether contemplating
> market entry, M&A or optimization of existing operations, the CSG, in
> collaboration with the member firm in China, can help U.S. companies implement
> cross-border investment strategies and navigate the associated risks.

> The CSG also co-ordinates with the China firm and the appropriate subsidiary of
> Deloitte LLP to assist Chinese companies seeking to access U.S. markets –
> expanding operations, raising capital and/or engaging in M&A. Our national
> network of bilingual professionals works closely with colleagues in China to
> deliver seamless service to globalizing Chinese companies.

*See* http://www.deloitte.com/view/en_US/us/Services/additional-services/chinese-

services-group/index.htm.[4]

---

[4] Throughout the relevant period, at least one employee of CSG has provided Longtop
with technical advice on US GAAP, regularly attended and participated in meetings of
Longtop's Audit Committee, advised on major accounting issues, and assisted in the
preparation and review of Longtop financial statements that were included in SEC filings.

32.    Even beyond Deloitte's Chinese Services Group, DTTL has consciously sought to benefit

from its international connections.  For example, its website reveals that on September

13, 2010, DTTL announced a new marketing strategy as follows:

> To sustain its market-leading performance and help clients navigate the post-crisis
> world, Deloitte is rolling out a new global strategy called "As One." The strategy
> enhances the network's ability to seamlessly deliver world-class services across
> borders, while leveraging the market-focused accountability of its member firm
> structure.
>
> "The financial crisis has fundamentally reshaped our economic, regulatory, and
> business landscapes," said [DTTL's Chief Executive Officer]. "Change creates
> opportunities for both Deloitte and our clients, and I believe that this is the right
> time to launch the As One strategy. We are committed to bringing the full breadth
> of the network's resources to help clients adapt to the new market realities, sustain
> our relentless focus on quality, and develop and deploy the best talent in every
> market in which Deloitte operates."

*See* http://www.deloitte.com/view/en_GX/global/press/global-press-releases-

en/969f3f0550dfa210VgnVCM3000001c56f00aRCRD.htm.

---

Further, throughout the relevant period, Deloitte's SEC Services Group, located in
Wilton, Connecticut, has provided professional services to D&T Shanghai with respect to
reviews of Longtop's SEC filings.

33.     D&T Shanghai thus has and benefits from its positioning within an international network,

which it has leveraged to conduct audits that would be relied on by the United States

securities markets.  *See generally In re Parmalat Securities Litig.*, 594 F. Supp. 2d 444

(S.D.N.Y. 2009) (holding that there were material issues of fact as to whether, under its

prior structure, DTTL could be held vicariously liable for actions of its member firms,

given the close relationship and coordination among them).


I declare under penalty of perjury that the foregoing is true and correct.

Executed on the __7__ day of September 2011.


_Lisa Deitch_
Lisa Deitch

# EXHIBIT A

# NON-PUBLIC

## UNITED STATES OF AMERICA
### Before the
### SECURITIES AND EXCHANGE COMMISSION

### May 25, 2011

| | |
|---|---|
| **In the Matter of**<br><br>**Longtop Financial Technologies Limited**<br><br>**File No. HO-11698** | **CORRECTED ORDER DIRECTING PRIVATE INVESTIGATION AND DESIGNATING OFFICERS TO TAKE TESTIMONY** |

## I.

The Commission's public official files disclose that:

Longtop Financial Technologies Limited ("Longtop") is a Cayman Islands corporation with principal offices in Hong Kong and Xiamen, China. Longtop is a foreign private issuer whose securities are registered with the Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 ("Exchange Act"). Longtop's American depositary shares ("ADS") are listed on the NYSE under the symbol LFT. Longtop files annual reports and other reports, including Form 20-F and Form 6-K, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

## II.

The Commission has information that tends to show that from at least 2007:

A. In possible violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Longtop, its officers, directors, employees, partners, subsidiaries, affiliates, and/or other persons or entities, directly or indirectly, in the offer or sale or in connection with the purchase or sale of securities, may have been or may be employing devices, schemes, or artifices to defraud, obtaining money or property by means of untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were or are made, not misleading, or engaging in transactions, acts, practices or courses of business which operated, operate, or would operate as a fraud or deceit upon any person. As part of these activities, such persons or entities, directly or indirectly, may have been or may be, among other things, making false statements of material fact or failing to disclose material facts concerning, among other things, Longtop's financial position, assets, revenues, and results of operations, financial statements, and conformance with Generally Accepted Accounting Principles.

B.      In possible violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-16 thereunder, Longtop, its officers, directors, employees, partners, subsidiaries, and/or affiliates, may have been or may be filing or causing to be filed with the Commission annual reports on Form 20-F, reports on Form 6-K, and any amendments thereto that may have contained and may contain false statements of material fact or may have omitted and may omit to state material facts necessary, or may have failed to add such further material information as may be necessary, in order to make the statements made, in the light of the circumstances under which they were or are made, not misleading.

C.      In possible violation of Section 13(b)(2)(A) of the Exchange Act, Longtop, its officers, directors, employees, partners, subsidiaries, and/or affiliates, and/or other persons or entities may have been or may be failing to or causing the failure to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected or reflect Longtop's transactions and disposition of assets.

D.      In possible violation of Section 13(b)(2)(B) of the Exchange Act, Longtop, its officers, directors, employees, partners, subsidiaries, and/or affiliates, and/or other persons or entities may have been or may be failing to or causing the failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: transactions were or are executed in accordance with management's general and specific authorization; transactions were or are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles or any other criteria applicable to such statements, and to maintain accountability for assets; access to assets was or is permitted only in accordance with management's general or specific authorization; and the recorded accountability for assets was or is compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

E.      In possible violation of Rule 13b2-1 under the Exchange Act, officers, directors, employees or partners of Longtop and/or other persons, directly or indirectly, may have been or may be falsifying or causing to be falsified, books, records, or accounts required to be maintained by Longtop.

F.      In possible violation of Section 13(b)(5) of the Exchange Act, Longtop, its officers, directors, employees, partners, subsidiaries, affiliates and/or other persons or entities may have been or may be knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying or causing to be falsified any book, record, or account required to be maintained by Longtop.

G.      In possible violation of Rule 13a-14 under the Exchange Act, the principal executive officer or officers and principal financial officer or officers of Longtop, or persons performing similar functions, at the time of filing of Longtop's Form 20-F, may have falsely signed or may be falsely signing personal certifications under Rule 13a-14 of the Exchange Act, indicating, in part, that they reviewed certain Longtop reports filed with the Commission and that, based on their knowledge, these reports did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the

2

circumstances under which such statements were made, not misleading with respect to the period covered by the report.

H.     In possible violation of Rule 13b2-2(a) under the Exchange Act, officers and/or directors of Longtop, directly or indirectly, may have made or caused to be made or may be making or causing to be made a material false or misleading statement, or may have omitted to state or caused another person to omit to state or may be omitting or causing to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant, in connection with an audit, review or examination of Longtop's required financial statements, or in the preparation or filing of any document or report required to be filed with the Commission.

I.     In possible violation of Rule 13b2-2(b) under the Exchange Act, Longtop's officers and/or directors, or persons acting under the direction thereof, directly or indirectly, may have taken action or may be taking action to coerce, manipulate, mislead, or fraudulently influence the independent public or certified public accountant engaged in the performance of an audit or review of Longtop's financial statements required to be filed with the Commission. While taking such action, Longtop's officers and/or directors, or persons acting under the direction thereof, knew or should have known that such action, if successful, could result in rendering Longtop's financial statements materially misleading.

J.     While engaged in the above-described activities, such persons or entities, directly or indirectly, may have been making use of any means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of any national securities exchange.

### III.

The Commission, deeming such acts and practices, if true, to be possible violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-14, 13a-16, 13b2-1, and 13b2-2 thereunder, finds it necessary and appropriate and hereby:

ORDERS, pursuant to the provisions of Section 20(a) of the Securities Act and Section 21(a) of the Exchange Act that a private investigation be made to determine whether any persons or entities have engaged in, or are about to engage in, any of the reported acts or practices or any acts or practices of similar purport or object; and

3

FURTHER ORDERS, pursuant to the provisions of Section 19(c) of the Securities Act, Section 21(b) of the Exchange Act, that, for purposes of such investigation, Antonia Chion, Lisa Deitch, Helaine Schwartz, Jonathan Cowen, Amybeth Garcia-Bokor, Ann Rosenfield, Holly Pal, and Avron Elbaum, and each of them, are hereby designated as officers of the Commission and are empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith as prescribed by law.

For the Commission, by the Division of Enforcement, pursuant to delegated authority.[1]

---

Elizabeth M. Murphy
Secretary

By: Jill M. Peterson
Assistant Secretary

---

[1] 17 CFR 200.30-4(a)(13).

# EXHIBIT B

exv99w2                                                                                   Page 1 of 3

EX-99.2 3 d82501exv99w2.htm EX-99.2

**EXHIBIT 99.2**

# Deloitte.
# 德勤

德勤华永会计师事务所有限公司
中国上海市延安东路222号
外滩中心30楼
邮政编码：200002

电话：+86 21 6141 8888
传真：+86 21 6335 0003
www.deloitte.com/cn

Deloitte Touche Tohmatsu CPA Ltd.
30/F Bund Center
222 Yan An Road East
Shanghai 200002, PRC

Tel:+86 21 6141 8888
Fax:+86 21 6335 0003
www.deloitte.com/cn

22 May 2011

**BY EMAIL & BY REGISTERED MAIL**

The Audit Committee
Longtop Financial Technologies Limited
No. 61 Wanghai Road, Xiamen Software Park
Xiamen, Fujian Province
People's Republic of China

Attention: Mr. Thomas Gurnee, Chairman of the Audit Committee

Dear Sirs,

**Longtop Financial Technologies Limited (the "Company") and together with its subsidiaries (the "Group")
Audit for the Year Ended 31 March 2011**

We hereby give you formal notice of our resignation as auditor of the Company.

**Background and significant issues encountered by Deloitte Touche Tohmatsu CPA Ltd. (China) ("Deloitte")**

As part of the process for auditing the Company's financial statements for the year ended 31 March 2011, we determined
that, in regard to bank confirmations, it was appropriate to perform follow up visits to certain banks. These audit steps were
recently performed and identified a number of very serious defects including: statements by bank staff that their bank had no
record of certain transactions; confirmation replies previously received were said to be false; significant differences in deposit
balances reported by the bank staff compared with the amounts identified in previously received confirmations (and in the
books and records of the Group); and significant bank borrowings reported by bank staff not identified in previously received
confirmations (and not recorded in the books and records of the Group).

In the light of this, a formal second round of bank confirmation was initiated on 17 May. Within hours however, as a result of
intervention by the Company's officials including the Chief Operating Officer, the confirmation process was stopped amid
serious and troubling new developments including: calls to banks by the Company asserting that Deloitte was not their
auditor; seizure by the Company's staff of second round bank confirmation documentation on

22 May 2011
The Audit Committee
Longtop Financial Technologies Limited
Page 2

bank premises; threats to stop our staff leaving the Company premises unless they allowed the Company to retain our audit files then on the premises; and then seizure by the Company of certain of our working papers.

In that connection, we must insist that you promptly return our documents.

Then on 20 May the Chairman of the Company, Mr. Jia Xiao Gong called our Eastern Region Managing Partner, Mr. Paul Sin, and informed him in the course of their conversation that "there were fake revenue in the past so there were fake cash recorded on the books". Mr. Jia did not answer when questioned as to the extent and duration of the discrepancies. When asked who was involved, Mr. Jia answered: "senior management".

We bring these significant issues to your attention in the context of our responsibilities under Statement on Auditing Standards No. 99 "Consideration of Fraud in a Financial Statement Audit" issued by the American Institute of Certified Public Accountants.

### Reasons for our resignation

The reasons for our resignation include: 1) the recently identified falsity of the Group's financial records in relation to cash at bank and loan balances (and also now seemingly in the sales revenue); 2) the deliberate interference by the management in our audit process; and 3) the unlawful detention of our audit files. These recent developments undermine our ability to rely on the representations of the management which is an essential element of the audit process; hence our resignation.

### Prior periods' financial reports and our reports thereon

We have reached the conclusion that we are no longer able to place reliance on management representations in relation to prior period financial reports. Accordingly, we request that the Company take immediate steps to make the necessary 8-K filing to state that continuing reliance should no longer be placed on our audit reports on the previous financial statements and moreover that we decline to be associated with any of the Company's financial communications during 2010 and 2011.

### Our consent

We hereby consent to a copy of this letter being supplied to the SEC and the succeeding auditor to be appointed.

exv99w2                                                                          Page 3 of 3

22 May 2011
The Audit Committee
Longtop Financial Technologies Limited
Page 3

**Section 10A of the Securities Exchange Act of 1934 (U.S.)**

In our view, without providing any legal conclusion, the circumstances mentioned above could constitute illegal acts for purposes of Section 10A of the Securities Exchange Act of 1934. Accordingly, we remind the Board of its obligations under Section 10A of the Securities Exchange Act, including the notice requirements to the U.S. Securities and Exchange Commission. You may consider taking legal advice on this.

Yours faithfully,

/s/ Deloitte Touche Tohmatsu CPA Ltd.

c.c.: The Board of Directors

# EXHIBIT C



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, N.E.**
**Mail Stop 5720-B**
**Washington, DC 20549**

                                                              **Helaine Schwartz**
**DIVISION OF ENFORCEMENT**                                   **Senior Counsel**
                                                              **Telephone: (202) 551-4826**

                                              May 27, 2011

<u>**SENT VIA UPS & SMAIL**</u>

Deloitte Touche Tohmatsu CPA Ltd.
c/o Douglas Cox, Esq.
Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306

            Re:  <u>In the Matter Longtop Financial Technologies Limited HO-11698</u>

Dear Mr. Cox,

The staff of the Securities and Exchange Commission is conducting an investigation in the
matter identified above.  The enclosed subpoena has been issued to to Deloitte Touche
Tohmatsu CPA Ltd. ("DTT") as part of this investigation.  In your telephone conversation
with the staff of the Commission on May 23, 2011, you represented that you would accept
service on behalf of DTT.  This subpoena requires DTT to give us documents.

        Please read the subpoena and this letter carefully.  This letter answers some
questions you may have about the subpoena.  You should also read the enclosed SEC Form
1662.  DTT must comply with the subpoena.  DTT may be subject to a fine and/or
imprisonment if it does not.

**Producing Documents**

*What materials do I have to produce?*

        The subpoena requires DTT to give us the documents described in the attachment to
the subpoena.  DTT must provide these documents by June 10, 2011.  The attachment to
the subpoena defines some terms (such as "document") before listing what DTT must
provide.

Deloitte Touche Tohmatsu CPA Ltd.
c/o Douglas Cox, Esq.
Page 2 of 4

Please note that if copies of a document differ in any way, they are considered separate documents and DTT must send each one. For example, if DTT has two copies of the same letter, but only one of them has handwritten notes on it, DTT must send both the clean copy and the one with notes.

If DTT prefers, it may send us photocopies of the originals. The Commission cannot reimburse DTT for the copying costs. The copies must be identical to the originals, including even faint marks or print. If DTT chooses to send copies, DTT <u>must</u> keep the originals in a safe place. The staff will accept the copies for now, but may require DTT to produce the originals later.

If DTT <u>does</u> send us photocopies, please put an identifying notation on each page of each document to indicate that it was produced by DTT, and number the pages of all the documents submitted. (For example, if DTT sends documents to the staff, it may number the pages B-1, B-2, B-3, etc., in a blank corner of the documents.) Please make sure the notation and number do not conceal any writing or marking on the document. If DTT sends us originals, please <u>do not</u> add any identifying notations.

*Do I need to send anything else?*

Please enclose a list briefly describing each item DTT sends. The list should state which paragraph(s) in the subpoena attachment each item responds to.

Please also include a cover letter stating whether DTT believes it has met its obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

In addition, please have the custodian of records, or other person familiar with the company's recordkeeping practices, complete the enclosed Declaration Certifying Records of Regularly Conducted Business Activity, as applicable.

*What if I do not send everything described in the attachment to the subpoena?*

The subpoena requires DTT to send <u>all</u> the materials described in it. If, for any reason -- including a claim of attorney-client privilege – DTT does not produce something called for by the subpoena, DTT should submit a list of what it is not producing. The list should describe each item separately, noting:

- its author(s);

- its date;

- its subject matter;

- the name of the person who has the item now, or the last person known to have it;

- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and

Deloitte Touche Tohmatsu CPA Ltd.
c/o Douglas Cox, Esq.
Page 3 of 4

- the reason DTT did not produce the item.

If DTT withholds anything on the basis of a claim of attorney-client privilege or attorney work product protection, DTT should also identify the attorney and client involved.

*Where should I send the materials?*

Please send the materials to:

>    Helaine Schwartz
>    U.S. Securities and Exchange Commission
>    Division of Enforcement
>    100 F Street, N.E.
>    Mail stop 5720-B
>    Washington, D.C. 20549

## Other Important Information

*May I have a lawyer help me respond to the subpoena?*

Yes. DTT has the right to consult with and be represented by its own lawyer in this matter. We cannot give legal advice.

*What will the Commission do with the materials I send?*

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission. This form has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation and the subpoena do not mean that we have concluded that DTT or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity, or security.

*Important Policy Concerning Settlements*

Please note that, in any manner in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

Deloitte Touche Tohmatsu CPA Ltd.
c/o Douglas Cox, Esq.
Page 4 of 4


*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions.  What should I do?*

If you have any other questions, you may call me at (202) 551-4826, or Lisa Deitch, my Assistant Director at (202) 551-4999.


Sincerely,

Helaine Schwartz
Senior Counsel

Enclosures:    Subpoena, SEC Form 1662, Declaration Certifying Records of Regularly Conducted Business Activity, SEC Data Delivery Standards



**SUBPOENA**

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### In the Matter of Longtop Financial Technologies Limited HO-11698

To:     Deloitte Touche Tohmatsu CPA Ltd.
        c/o Douglas Cox, Esq.
        Gibson, Dunn & Crutcher
        1050 Connecticut Avenue, N.W.
        Washington, DC 20036-5306

[X]     **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena
to officers of the Securities and Exchange Commission, at the place, date and time specified
below.

Helaine Schwartz, U.S. Securities and Exchange Commission, 100 F St., N.E.,

Mail Stop 5720-B, Washington, DC 20549 on or before June 10, 2011.

[ ]     **YOU MUST TESTIFY** before officers of the Securities and Exchange
Commission, at the place, date and time specified below.

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
Failure to comply may subject you to a fine and/or imprisonment.

By: *Helaine Schwartz*                    Date:  May 27, 2011
    Helaine Schwartz
    Senior Counsel
    (202) 551-4826

I am an officer of the Securities and Exchange Commission authorized to issue
subpoenas in this matter. The Securities and Exchange Commission has issued a formal
order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and
Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS:If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**ATTACHMENT TO May 27, 2011 SUBPOENA TO**
**Deloitte Touche Tohmatsu CPA Ltd.**

**A.    Definitions and Instructions**

1.      The terms , Deloitte Touche Tohmatsu CPA Ltd. ("DTT"), "you" or "your"
mean DTT and all of its U.S. and non-U.S. parents, subsidiaries, divisions, affiliates,
predecessors, successors, officers, directors, partners, limited partners, employees, agents,
independent contractors, and individuals and entities used by DTT in the performance of any
services to its audit clients, as well as aliases, code names, trade names, or business names
used by, or formerly used by, any of the foregoing.  This includes any affiliated and unaffiliated
outside firms, foreign offices, and individuals used by DTT in the performance of any services
to its audit clients, or that participated in the performance of these services, or whose work
was relied upon by DTT in the performance of these services.

2.   .    The term Longtop Financial Technologies Limited ("Longtop") means
Longtop and all of its  agents, representatives, divisions, groups, parents, subsidiaries,
consolidated Variable-Interest Entities, subdivisions, predecessors, successors, and affiliated
entities, and the present and former officers, directors, employees, partners, principals,
representatives, and agents of any of the foregoing entities.

3.      The term "document" includes, but is not limited to, all records, materials and
other tangible forms of expression in your possession or custody, or under your control,
whether originals, copies, annotated copies, drafts or final versions, and however created,
produced, stored or maintained, including, but not limited to, working papers, audit
documentation, charts, lists, logs, spreadsheets, financial information or analyses, books,
papers, files, notes, memoranda, reports, schedules, charts, lists, transcriptions,
correspondence, telegrams, telexes, wire messages, telephone messages, calendars, diaries,
budgets, invoices, audio and video recordings, electronic mail, text messages, electronic data
compilations, computer disks (or hard copy of the data contained on such disks), and other
electronic media, microfilm, microfiche, and storage devices.

4.      The term "working papers" includes, but is not limited to, top files, financial
statement files, planning files, correspondence files, administrative files, internal control
files, SEC-related files, desk files, bank and other audit confirmations, bank statements,
permanent files, indices or legends that outline the contents of or describe the referencing
system and abbreviations used in the working papers, and all documents relied upon in
order for DTT to render its audit or attestation reports regarding Longtop, including all
audit reports of affiliated or non-affiliated accounting firms.

5.      Reference to a person shall also include that person's trusts, affiliates,
employees, agents, partners, and independent contractors, as well as aliases, code names,
trade names, or business names used by, or formerly used by, any of the foregoing.

6.      Reference to an entity shall also include that entity's parents, subsidiaries,
affiliates, predecessors, successors, officers, directors, employees, agents, partners, and

independent contractors, as well as aliases, code names, trade names, or business names used by, or formerly used by, any of the foregoing.

7.     The disjunctive ("or") shall be deemed to include the conjunctive ("and"), and the conjunctive ("and") shall be deemed to include the disjunctive ("or"); and each of the functional words "each," "every," "any" and "all" shall be deemed to include each of the other functional words.

8.     The term "communication" includes any transmittal or receipt of information, whether by chance or prearranged, formal or informal, oral, written or electronic, and includes without limitation:  conversations, meetings and discussions in person; conversations, meetings and discussions by telephone; and written correspondence through the use of the mails, courier services, electronic media (such as electronic mail), and telephone lines and wires.

9.     A communication or document "concerning," "involving," "relating," "related," or "which relates" to any given subject means any communication or document that constitutes, contains, discusses, embodies, evidences, reflects, identifies, states, refers to, deals with, bears upon, or is in any way pertinent to that subject, including documents concerning the preparation of other documents.

10.     Documents produced pursuant to this attachment shall be produced in the order in which they appear in your files and shall not be shuffled or otherwise rearranged. Documents that in their original condition were stapled, clipped, or otherwise fastened together shall be produced in that form.

11.     Electronic mail produced pursuant to this attachment shall be provided in its original electronic format on a CD-ROM disk with a label clearly identifying the disk as containing material responsive to this attachment and indicating the request to which the documents are responsive.  For the time being, you need not provide hard copies of electronic mail messages that are produced in electronic format.

12.     Provide a list of the documents you produce, indicating in each instance the request to which the document is responsive.  Also, identify and generally describe all requested documents that you do not produce and indicate the location of each such document and your reason for not producing it.

13.     If you withhold any document based on a claim of privilege, please provide the following information as to each such document:  (a) the author(s); (b) the date the document was created; (c) each person who received a copy of the document or was informed of its contents; (d) the person who now has the document or was last known to have it; (e) the general subject matter of the document; and (f) the privilege asserted.

14.     If any documents responsive to this subpoena were in your possession, custody, or control at some time in the past, but are no longer available, provide a list of such documents, indicating in each instance the request to which the document was

responsive. Please provide the following information with respect to each such document: (a) the author(s); (b) the date the document was created; (c) each person who received a copy of the document or was informed of its contents; (d) the person who now has the document or was last known to have it; (e) the general subject matter of the document; (f) a detailed description of the document; and (g) a detailed and complete explanation of why such document is no longer in your possession, custody, or control.

15.   No agreement by the Securities and Exchange Commission or its staff purporting to modify, limit, or otherwise vary this subpoena is binding on the Commission or its staff unless confirmed or acknowledged in writing by the Commission or its staff.

## B.   Production of Documents

**Produce both the original Chinese documents and English translations.**

Unless otherwise specified, the time period applicable to these requests is January 1, 2007, to the present.

Produce the following in your possession, custody, or control:

1.   Documents related to DTT's resignation as Longtop's auditor;

2.   Documents relating to, or referenced in DTT's May 22, 2011, letter to Longtop's Audit Committee pursuant to Section 10A of the Securities Exchange Act of 1934;

3.   Documents sufficient to identify each and every DTT employees who provides, or has provided services to Longtop, his/her full name(s) in Chinese and English, titles, duties, nationality, passport number (non-US citizen) or Social Security number (US citizen or resident), resident identity card number, all current work and personal addresses, telephone numbers, fax numbers, and electronic mail addresses, name of spouse, date of birth, height, and weight, and each financial institution where he/she has an account. In lieu of producing such documents, you may produce such information in consolidated form in a single document.

4.   For each and every partner, officer, shareholder, or direct or indirect beneficial owner of DTT currently working or assigned to work, on a permanent or temporary basis in the United States, produce documents sufficient to identify his/her name(s), each of his/her business and residential address(es) in the United States, and each of his/her business and residential telephone number(s) in the United States.

5.   Produce documents reflecting DTT's document retention, alteration, destruction, storage and archiving policies and practices.

6.   All documents concerning any engagement by, or services rendered to Longtop

during the period January 1, 2007 to the present, including but not limited to quarterly reviews, annual audits, reviews of interim financial information, concurring partner reviews, negative assurance reviews, acquisition reviews, letters for underwriters or other requesting parties, general accounting, business, or tax advice, reports, and services relating to Longtop's filings with the U.S. Securities and Exchange Commission including but not limited to registration statements and Longtop's Initial Public Offering.  Such documents should include, but not be limited to:

    a.    All documents concerning planning for the audit or review of Longtop's financial statements, including but not limited to, working papers *(Electronic working papers should be produced in native format organized by how the files were originally maintained and with all electronic links intact)*, supporting materials, audit confirmations, bank statements, bank confirmations, planning memoranda, audit programs, materiality assessments, representation letters, engagement letters, and general, permanent, desk, bulk, billing and correspondence files; and

    b.    Documents identifying all services provided by DTT to Longtop, including, but not limited to, time-sheets, invoices/bills, payment history, and other documents reflecting fees charged by DTT for audit, interim review, audit related, consulting, and other non-audit services. Documents should identify the amount of fees for each audit and review billed to and/or paid by Longtop to all affiliated and unaffiliated outside firms, foreign offices, or individuals.

7.    Produce all personal and desk files of persons who provided services, worked on the audits and interim reviews concerning Longtop.  Also produce all diaries, calendars or other organization or scheduling logs of members of the engagement team that relate to meetings, contacts, and conversations concerning Longtop.

8.    Produce all documents reflecting communications concerning the services rendered to Longtop referred to in Paragraph (4) above including, but not limited to:

    a.    All communications between or among the audit engagement team including any affiliated or unaffiliated outside firm or individual.  Include documents relating to or memorializing any meetings, telephone conversations or communications with Longtop's management, employees, directors, Board of Directors, or any committee of the Board of Directors;

    b.    All communications between or among DTT and Longtop, and/or any officer, director, employee, or agent of Longtop; and

    c.    All communications between or among DTT and any third party concerning the audits or interim reviews, including business intelligence reports,

investigative reports, or similar documents.

9.    Produce all emails relating to Longtop from January 1, 2007 to the present.

[FOR FOREIGN RECORDS]

## DECLARATION OF [*Insert Name*] CERTIFYING RECORDS OF REGULARLY CONDUCTED BUSINESS ACTIVITY

I, the undersigned, [*insert name*], declare that:

1.   I am employed by [*insert name of company*] as [*insert position*] and by reason of my position am authorized and qualified to make this declaration. [*if possible supply additional information as to how person is qualified to make declaration, e.g., I am custodian of records, I am familiar with the company's recordkeeping practices or systems, etc.*]

2.   I further certify that the documents [*attached hereto or submitted herewith*] and stamped [*insert bates range*] are true copies of records that were:

   (a) made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

   (b) kept in the course of regularly conducted business activity; and

   (c) made by the regularly conducted business activity as a regular practice.

3.   I understand that a false statement in this declaration could subject me to criminal penalty under the laws of [*country where declaration is signed*].

   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on  [*date*]  at  [*place of execution*].

_____
[*Name*]

## SEC Data Delivery Standards

The following document describes the technical requirements for electronic productions produced to the Securities and Exchange Commission. Any proposed formats other than what is listed below (including databases) should not be produced without discussions and approval from the legal and technical staff of the Division of Enforcement. The SEC uses Concordance 9.58 and Concordance Image 4.5 to review their electronic document collections.

**General Instructions**
1. Provide a cover letter with each production which includes the Bates range and a general description of the documents and/or the custodian(s). The cover letter should also summarize the number of records, images, emails and attachments in the production. ***The cover letter MUST be imaged and provided as the first record in the delimited text file for all preferred formats discussed below.***
2. Produce documents in the same form that it was created or maintained. Documents created or stored electronically should not be produced in hard copy.
3. Deliver data on CD, DVD, or hard drive. The smallest number of media is required. If the collection is large enough to fit onto a hard drive, the SEC can provide one, if needed.
4. Label all media submitted. Include on the label at least the following information: case number, production date, Bates range and disk number, if applicable.
5. Organize all productions by custodian unless otherwise instructed.
6. Provide all productions free of computer viruses.
7. Provide all passwords for documents, files, or compressed archives provided in the production under a separate cover.
8. Overview of preferred formats for production
   a. Paper Documents - Scanned paper converted/processed to TIFF files, Bates numbered, and includes OCR text
   b. Email Collections – Electronic mail converted/processed to TIFF files for the email and attachment(s), Bates numbered, includes a link to the email or native file, and includes full text.
   c. Native Files – Electronic documents converted/processed to TIFF files, Bates numbered, includes a link to the native file, and includes full text.

## Paper Documents

1) **Image files.** Images must be Group IV TIFF files (single or multi-page files). All images should be Bates numbered. The number of files per folder should be limited to 1,000 files.

2) **Delimited Text file.** At a minimum, this file must contain an IMAGEID field (image key used to reference images in Concordance Image). The image key must be unique, **fixed length**, and CANNOT be the Bates number of the document. If you change the length of the image key in a subsequent production, the production will be rejected. Bates numbers (endorsed on the documents and included in the delimited text file) MUST be delivered in a consistent manner for sorting purposes. For example, if the first production delivered is Bates stamped ABC-0000001-ABC-0005267, subsequent productions with the same prefix must have the same format (spaces, dashes, etc.) and the same number of digits. For example ABC 0005268, ABC0005268 or ABC-00005268 is not acceptable. The delimited text file must also include a header record. The delimiters for the file must be as follows:

Comma – ASCII character   20
Quote -         "     "     254
Newline -     "     "    174

# SEC Data Delivery Standards

3) **OCR Text.** The OCR text provided to the SEC can be delivered two ways. (1) The OCR text can be delivered as multi-page ASCII files. The name of the file must match the IMAGEID field. (2) The OCR text can be included in the Delimited Text file (OCRTEXT field).

If possible (regardless of delivery method), please place page markers at the beginning or end of each OCR text page as shown:

\*\*\* LA000001 \*\*\*

The data surrounded by \*\*\* is the Concordance Image ImageID (see example below).

4) **Concordance Image Cross-Reference file.** The Concordance Image cross-reference file is a comma delimited file consisting of six fields per line. There must be a line in the cross-reference file for every image in the database. The format for the file is as follows:

```
ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBrea
k,PageCount
```

*ImageID*: The unique designation that Concordance and Concordance Image use to identify an image.

*VolumeLabel*: Optional.

*ImageFilePath*: The full path to the image file.

*DocumentBreak*: If this field contains the letter "Y," then this is the first page of a document. If this field is blank, then this page is not the first page of a document.

*FolderBreak*: Leave empty.

*BoxBreak*: Leave empty.

*PageCount*: Optional.

## SEC Data Delivery Standards

**Sample Data**

Delimited Text file:

þFIRSTBATESþ☐þLASTBATESþ☐þIMAGEIDþ
þMT00000001þ☐þMT00000002þ☐þIMG0000001þ
þMT00000003þ☐þMT00000004þ☐þIMG0000003þ
þMT00000005þ☐þMT00000006þ☐þIMG0000005þ

Concordance Image Cross-reference File:

IMG0000001,,E:\001\00010001.TIF,Y,,,
IMG0000002,,E:\001\00010002.TIF,,,,
IMG0000003,,E:\001\00010003.TIF,Y,,,
IMG0000004,,E:\001\00010004.TIF,,,,
IMG0000005,,E:\001\00010005.TIF,Y,,,
IMG0000006,,E:\001\00010006.TIF,,,,

3

## SEC Data Delivery Standards

Multi-page OCR Text File (IMG0000001.txt):

\*\*\* IMG0000001 \*\*\*

Protocol Reparding Data and Document Migration

This Protocol Regarding Data and Document Migration ("Protocol"), effective as of February 1, 2002, applies to all Enron employees in North America who are transferring from Enron Corp. or its affiliates (collectively, "Enron") to UBS AG or its affiliates (collectively, "UBS"). All data must bemigrated by Friday, Februaty 8,2002.

In General

Enron has agreed to provide IJBS with the information and data that is necessary to operate thegas and power business in North America, subject to the limitations in Section II below. This Protocol will address how employees transferring to UBS should migrate the data ordocuments that they are entitled to have and that will be necessary for them to do their job atUBS. Employees should migrate only the data that is absolutely necessary for them toperform their job at UBS. if there is a doubt as to whether the information is necessary, thedata should not be migrated at this time. H' it is deemed necessary in the future, it can beobtained from Enron at that time, using the instructions contained in Exhibit 5.

This Protocol applies to data and information stored in all locations, including files, officecomputers, home computers, portable devices (such as laptop computers, Blackberry or otherhandhelds), or other such devices. Laptops should contain only information that is approvedfor migration.

All employees transferring to UBS must comply with the record preservation order ofthe U.S. Bankruptcy Court, as described below. All information that is migrated is subjectto review by government investigators. To ensure compliance with this Protocol, Enron willconduct random audits of information selected for migration.

II. Limitations on Information to Be Migrated

* Employees should migrate only information that is absolutely necessary to performtheirjobs atUBS.

* No iiiformation 01) Enroii transactions or busitiess deals that occurred prior toFebruary 8,2002 may be migrated to UBS without prior approval of the EnronLegal Department.

* No information about an Enron customer, other than contact and addressinformation, should be migrated to UBS without prior approval of the EnronLegal Department.* Information protected by confidentiality restrictions shall not be migrated to UBS
without prior approval by the Enron Legal Department.

III. Migration of Electronic Data

Electronic data may be migrated to UBS, subject to the limitations described in Section IIabove. All migration of electronic data must be complete by midnight on Thursday,February 7,2002.

ECd-000006469
CONFIDENTIAL

# SEC Data Delivery Standards

*** IMG0000002 ***

A. Electronic Mail
1. E-Mail Address. Employees transferring to UBS will be provided a new emailaddress (in most cases, the new address will be:firsiname.lastname@ubswenergy.com). iT will set the system to send anautomatic response to any external c-mails sent to an Enron email address withthe details of the individual's new UBS address.
2. Cooies of Migrated E-Mail. Employees transferring to IJBS will not haveaccess to their Enron electronic mailbox after the transaction closes.Employees transferring to UB S must copy all electronic mail items they wishto retain, subject to the restrictions described in Section II above, inaccordance with instructions attached as Exhibit I to this Protocol.
B. Contact List, Calendar, and Tasks
The contact list, calendar, tasks, and notes contained in Microsoft Outlook or otheroffice management software programs will be transferred by IT to employees' UBSworkstation on February 8, 2002.
If, however, those applications contain confidential data or other inappropriate orunnecessary information as described in Section II above, then each employee shouldprint such information and then delete it from the system before February 8, 2002.Printouts should be provided to Richard Sanders (EB3827) or Harlan Murphy(EB381 1) in the Enron Legal Department.
Portable email devices should be cleared of all information that is not migratedpursuant to this Protocol.
C. Common Drives (0 and M)
Employees who wish to transfer permissible data from common drives to UBS shouldcopy that data to the following drive: UBSWE 0:. Each employee will be responsiblefor this task, and each employee will be responsible for compliance with therestrictions set forth in this Protocol. (Lists of documents, directories, or folders to betransferred that were previously provided to iT will not be taken into consideration.)Written instructions on performing these tasks are attached as Exhibit 2.
D. HDrive
All compliant information stored in the H drive should be copied to a new UBS Hdrive in accordance with the instructions attached as Exhibit 3. Any information nottransferred to the new UBS H drive should be left in the former Enron H drive.
E. C Drive
Because the C Drive may physically be moved to UBS, the procedure for C Drivemigration differs slightly from that of the other drives. This procedure will requireextra care on the part of the user.
If an employee has information that should not be migrated to UBS, please call theResolution Center at x3-141 I for assistance. If an employee's C-Drive does notC:\ThMP\TRNEDO..ckc 2

ECd-000006470
CONFIDENTIAL

## SEC Data Delivery Standards

Data File with OCR text (first record):

þFIRSTBATESþ☐þLASTBATESþ☐þIMAGEIDþ☐þOCRTEXTþ
þMT00000001þ☐þMT00000002þ☐þIMG00000001þ☐þ þ*** IMG0000001 ***®®Protocol Reparding Data and
Document Migration®®This Protocol Regarding Data and Document Migration ("Protocol"), effective as of
February 1, 2002,applies to all Enron employees in North America who are transferring from Enron Corp. or
itsaffiliates (collectively, "Enron") to UBS AG or its affiliates (collectively, "UBS"). All data must bemigrated by
Friday, Februaty 8,2002.®In General®Enron has agreed to provide IJBS with the information and data that is
necessary to operate thegas and power business in North America, subject to the limitations in Section II below.
ThisProtocol will address how employees transferring to UBS should migrate the data ordocuments that they are
entitled to have and that will be necessary for them to do their job atUBS. Employees should migrate only the data
that is absolutely necessary for them toperform their job at UBS. if there is a doubt as to whether the information is
necessary, thedata should not be migrated at this time. H' it is deemed necessary in the future, it can beobtained
from Enron at that time, using the instructions contained in Exhibit 5.®This Protocol applies to data and
information stored in all locations, including files, officecomputers, home computers, portable devices (such as
laptop computers, Blackberry or otherhandhelds), or other such devices. Laptops should contain only information
that is approvedfor migration.®All employees transferring to UBS must comply with the record preservation order
ofthe U.S. Bankruptcy Court, as described below. All information that is migrated is subjectto review by
government investigators. To ensure compliance with this Protocol, Enron willconduct random audits of
information selected for migration.®II. Limitations on Information to Be Migrated®* Employees should migrate
only information that is absolutely necessary to performtheirjobs atUBS.®* No iiiformation 01) Enroii
transactions or busitiess deals that occurred prior toFebruary 8,2002 may be migrated to UBS without prior
approval of the EnronLegal Department.®* No information about an Enron customer, other than contact and
addressinformation, should be migrated to UBS without prior approval of the EnronLegal Department.*
Information protected by confidentiality restrictions shall not be migrated to UBS®without prior approval by the
Enron Legal Department.®III. Migration of Electronic Data®Electronic data may be migrated to UBS, subject to
the limitations described in Section IIabove. All migration of electronic data must be complete by midnight on
Thursday,February 7,2002.®®®ECd-000006469®CONFIDENTIAL®®®®*** IMG0000002 ***2/5,!)2®®A.
Electronic Mail®1. E-Mail Address. Employees transferring to UBS will be provided a new emailaddress (in most
cases, the new address will be:firsname.lastname@ubswenergy.com). iT will set the system to send anautomatic
response to any external e-mails sent to an Enron email address withthe details of the individual's new UBS
address.®2. Cooies of Migrated E-Mail. Employees transferring to IJBS will not haveaccess to their Enron
electronic mailbox after the transaction closes.Employees transferring to UB S must copy all electronic mail items
they wishto retain, subject to the restrictions described in Section II above, inaccordance with instructions attached
as Exhibit I to this Protocol.®B. Contact List, Calendar, and Tasks®The contact list, calendar, tasks, and notes
contained in Microsoft Outlook or otheroffice management software programs will be transferred by IT to
employees' UBSworkstation on February 8, 2002.®If, however, those applications contain confidential data or
other inappropriate orunnecessary information as described in Section II above, then each employee shouldprint
such information and then delete it from the system before February 8, 2002.Printouts should be provided to
Richard Sanders (EB3827) or Harlan Murphy(EB381 1) in the Enron Legal Department.®Portable email devices
should be cleared of all information that is not migratedpursuant to this Protocol.®C. Common Drives (0 and
M)®Employees who wish to transfer permissible data from common drives to UBS shouldcopy that data to the
following drive: UBSWE 0:. Each employee will be responsiblefor this task, and each employee will be
responsible for compliance with therestrictions set forth in this Protocol. (Lists of documents, directories, or
folders to betransferred that were previously provided to iT will not be taken into consideration.)Written
instructions on performing these tasks are attached as Exhibit 2.®D. HDrive®All compliant information stored in
the H drive should be copied to a new UBS Hdrive in accordance with the instructions attached as Exhibit 3. Any
information nottransferred to the new UBS H drive should be left in the former Enron H drive.®E. C
Drive®Because the C Drive may physically be moved to UBS, the procedure for C Drivemigration differs slightly
from that of the other drives. This procedure will requireextra care on the part of the user.®If an employee has
information that should not be migrated to UBS, please call theResolution Center at x3-141 I for assistance. If an
employee's C-Drive does notC:\ThMP\TRNEDO..ckc 2®®ECd-000006470®CONFIDENTIALþ

## SEC Data Delivery Standards

**Email Collections**

## Preferred Format:  Delimited Text with Images and Native Attachments

1) **Image files.**  The producing party will provide a TIFF image for each page of the email and attachment(s).  Images must be Group IV TIFF files (single or multi-page files).  All images should be Bates numbered.  The number of TIFF files per folder should be limited to 1,000 files.  Refer to the Paper Documents section for Bates and image key numbering rules.

2) **Native files.**  The producing party will provide a copy of the email and native attachment files.  The number of native files per folder should be limited to 1,000 files.

3) **Delimited Text file.**  The text and metadata of the email and the attachment(s) is extracted and entered in the appropriate fields and provided as an ASCII delimited text file.  The email will be the "*parent*" and the attachment(s) will be the "*child.*"  An email may have more than one *child*.  The *child* attachment's Bates number will be listed in the *parent* email's coded fields under *CHILD_BATES*.  If there is more than one attachment, list the first Bates number of each attachment and separate them by semi-colons (;).  The *parent* email's Bates number will be listed in the *child(s)* attachment(s) under *PARENT_BATES.*  The *child/children* will immediately follow the parent record.  The following is a field definition table of the data requested, including sample data for an email and an attachment.

**Sample Data – Email**

| Field | Sample Data | Comment |
|---|---|---|
| FIRSTBATES | BT 000001 | First Bates number of email |
| LASTBATES | BT 000008 | Last Bates number of email |
| BEGATTACH | BT 000001 | First Bates number of attachment range |
| ENDATTACH | BT 000015 | Last Bates number of attachment range |
| PARENT_BATES | BT 000001 | First Bates number of parent email |
| CHILD_BATES | BT 000009; BT 000012 | First Bates number of "child" attachment(s); can be more than one Bates number listed; depends on number of attachments |
| CUSTODIAN | John Smith | Mailbox where the email resided |
| FROM | John Smith | Sender |
| TO | Janice Coffman | Recipient(s) |
| CC | Frank Thompson | Carbon copy recipient(s) |
| BCC | John Cain | Blind carbon copy recipient(s) |
| SUBJECT | Board Meeting Minutes for 7/1/03 | Subject of the email |
| DATE_SENT | 10/10/2005 | Date the email was sent |
| TIME_SENT | 07:05 PM | Time the email was sent; must be a separate field and |

## SEC Data Delivery Standards

| | | |
|---|---|---|
| | | cannot be combined with the DATE_SENT field |
| LINK | D:\SEC Production\BT 000001.msg | Hyperlink to the email; should be named per the FIRSTBATES number |
| FILE_EXTEN | MSG | The file extension of the email; will vary depending on the email format |
| AUTHOR | | Empty for email |
| DATE_CREATED | | Empty for email |
| TIME_CREATED | | Empty for email |
| DATE_MOD | | Empty for email |
| TIME_MOD | | Empty for email |
| DATE_ACCESSD | | Empty for email |
| TIME_ACCESSD | | Empty for email |
| PRINTED_DATE | | Empty for email |
| FILE_SIZE | 5,952 | Size of email in KB |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes for 7/1/03.msg | Location of email |
| TEXT | From: Smith, John [XYZ Corp]<br>Sent:  Friday, July 11, 2003 4:42 PM<br>To: Coffman, Janice [CDT Corp]<br>Subject: Board Meeting Minutes for 7/1/03<br><br>Janice;<br>Attached is a copy of the July Board Meeting Minutes for your review.  Please let me know if you have any questions.<br><br>John Smith<br>Assistant Director<br>Information Technology<br>Phone: (202) 555-1111<br>Fax: (202) 555-1112<br>Email: jsmith@xyz.com | Text of the email |

**Sample Data - Attachment**

| Field | Sample Data | Comment |
|---|---|---|
| FIRSTBATES | BT 000009 | First Bates number of attachment |
| LASTBATES | BT 000011 | Last Bates number of attachment |
| BEGATTACH | BT 000001 | First Bates number of the attachment range |
| ENDATTACH | BT 000015 | Last Bates number of the attachment range |
| PARENT_BATES | BT 000001 | First Bates number of parent |

## SEC Data Delivery Standards

|  |  | email |
|---|---|---|
| CHILD_BATES |  |  |
| CUSTODIAN | John Smith | Mailbox where the email resided |
| FROM |  | Empty for attachment |
| TO |  | Empty for attachment |
| CC |  | Empty for attachment |
| BCC |  | Empty for attachment |
| SUBJECT |  | Empty for attachment |
| DATE_SENT |  | Empty for attachment |
| TIME_SENT |  | Empty for attachment |
| LINK | D:\SEC Production\BT 000009.doc | Hyperlink to the native attachment named per the FIRSTBATES number |
| FILE_EXTEN | DOC (attachment – ex. Word document) | The file extension will vary depending on the document type |
| AUTHOR | John Smith | Attachment/native file metadata |
| DATE_CREATED | 10/08/2005 | Attachment metadata |
| TIME_CREATED | 07:05 PM | Time the attachment was created; must be a separate field and cannot be combined with the DATE_CREATED field. |
| DATE_MOD | 10/19/2005 | Attachment metadata |
| TIME_MOD | 07:05 PM | Time the attachment was modified; must be a separate field and cannot be combined with the DATE_MOD field. |
| DATE_ACCESSD | 10/10/2005 | Attachment metadata |
| TIME_ACCESSD | 07:05 PM | Time the attachment was accessed; must be a separate field and cannot be combined with the DATE_ACCESSD field. |
| PRINTED_DATE | 10/19/2005 | Attachment metadata |
| FILE_SIZE | 765,952 | Size of file in KB |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes for 7/1/03.msg\Meeting Minutes.doc | Path where attachment file was stored |
| TEXT | Meeting Minutes for Teleconference 10/1/03

Discussion over employee stock options transpired. Decision was made to offer the options as part of the employee's Christmas bonus.

Announcement was made regarding Roland Moore | Text of the attachment |

9

## SEC Data Delivery Standards

| | being promoted to Assistant Director | |
|---|---|---|

The delimited text file must include a header record.  The delimiters for the file must be as follows:

Comma – ASCII character   20
Quote -        "        "        254
Newline -        "        "        174

4) **Full Text.**  When the full text is not provided in the ASCII delimited text file or if text exceeds 12MB in the TEXT field, the full text provided to the SEC can be delivered as multi-page ASCII files.  The name of the file must match the image key field.  Any document in which text cannot be extracted should be OCR'd, particularly in the case of PDFs without embedded text.

5) **Concordance Image Cross-Reference file.**  The Concordance Image cross-reference file is a comma delimited file consisting of six fields per line.  There must be a line in the cross-reference file for every image in the database.

We will also accept the following formats:

**PST** – a personal storage file native to Microsoft Outlook.  You must provide any necessary passwords or decryption.

**NSF** – a personal storage file native to Lotus Notes.  You must provide any necessary passwords or decryption.

## Native Files

## Preferred Format:  Delimited Text with Images and Links to Native Files:

1. **Image files.**  The producing party will provide a TIFF image of the native files.  Images must be Group IV TIFF files (single or multi-page files).  All images should be Bates numbered.  The number of TIFF files per folder should be limited to 1,000 files.  Refer to the Paper Documents section for Bates and image key numbering rules.

2. **Native files.**   The producing party will provide a copy of the native files.  The number of native files per folder should be limited to 1,000 files.

3. **Delimited Text file.**  An ASCII delimited file containing the metadata associated with the file, text extracted from the native file, and a directory path to the native file.  The fields to be included in the production are as follows:

| FIELD | SAMPLE DATA | COMMENT |
|---|---|---|
| FIRSTBATES | GT000001 | First Bates number of native file |
| LASTBATES | GT000001 | Last Bates number of native file |
| CUSTODIAN | John Smith | Individual from whom the documents originated |

10

## SEC Data Delivery Standards

| | | |
|---|---|---|
| LINK | D:\SEC Production\GT000001.doc | Hyperlink to native file named per the FIRSTBATES number |
| AUTHOR | John Smith | |
| DATE_CREATED | 10/08/2005 | |
| TIME_CREATED | 07:05 PM | Time the document was created; must be a separate field and cannot be combined with the DATE_CREATED field. |
| DATE_MOD | 10/09/2005 | |
| TIME_MOD | 07:05 PM | Time the document was modified; must be a separate field and cannot be combined with the DATE_MOD field. |
| DATE_ACCESSD | 10/10/2005 | |
| TIME_ACCESSD | 07:05 PM | Time the attachment was accessed; must be a separate field and cannot be combined with the DATE_ACCESSD field. |
| PRINTED_DATE | 10/10/2005 | |
| FILE_SIZE | 765,952 | Size of file in KB |
| PATH | J:\SHARED\SMITHJ\Meeting Minutes.doc | Path where native file was stored |
| TEXT | Meeting Minutes for Teleconference 10/1/03  Discussion over employee stock options transpired. Decision was made to offer the options as part of the employee's Christmas bonus.  Announcement was made regarding Roland Moore being promoted to Assistant Director | Text extracted from native file. |

The delimited text file must include a header record.  The delimiters for the file must be as follows:

        Comma – ASCII character   20
        Quote -        "       "        254
        Newline -      "       "        174

4) **Full Text.** When the full text is not provided in the ASCII delimited text file or if text exceeds 12MB in the TEXT field, the full text provided to the SEC can be delivered as multi-page ASCII files.  The name of the file must match the image key field.  Any document in which text cannot be extracted should be OCR'd, particularly in the case of PDFs without embedded text.

11

## SEC Data Delivery Standards

5) **Concordance Image Cross-Reference file.**  The Concordance Image cross-reference file is a comma delimited file consisting of six fields per line.  There must be a line in the cross-reference file for every image in the database.

**Optional Format:**

Native files will be delivered in Custodian named folders.

If PDFs are delivered, all PDF files must meet the following requirements:
1. All PDFs must be unitized i.e. each PDF represents a discrete document; a single PDF cannot contain multiple documents
2. All PDFs must contain embedded text to include all discernable words within the document, not selected text.
3. If Bates endorsed, the PDF file will be named as the Bates range, with ALL document text contained within.

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides as follows:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1. *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony whenever during your testimony you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned to afford you the opportunity to arrange to do so.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury.* Section 1621 of Title 18 of the United States Code provides as follows:

> Whoever . . . having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly . . . willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . . is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years or both . . . .

5. *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

SEC 1662 (03-10)

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you or subject you to fine, penalty or forfeiture.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.    *Formal Order Availability.*  If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C.  Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation.  Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding.  Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner.  It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto.  Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings.  That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D.  Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA.  That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received.  Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received.  If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self addressed envelope.

## E.  Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena.*  The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.*  One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment

Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

**F. Effect of Not Supplying Information**

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, if the subpoena was issued pursuant to the Securities Exchange Act of 1934, the Investment Company Act of 1940, and/or the Investment Advisers Act of 1940, and if you, without just cause, fail or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena, you may be found guilty of a misdemeanor and fined not more than $1,000 or imprisoned for a term of not more than one year, or both.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

**G. Principal Uses of Information**

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

**H. Routine Uses of Information**

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To coordinate law enforcement activities between the SEC and other federal, state, local or foreign law enforcement agencies, securities self regulatory organizations, and foreign securities authorities.

2. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

3. Where there is an indication of a violation or potential violation of law, whether civil, criminal or regulatory in nature, and whether arising by general statute or particular program statute, or by regulation, rule or order issued pursuant thereto, the relevant records in the system of records may be referred to the appropriate agency, whether federal, state, or local, a foreign governmental authority or foreign securities authority, or a securities self-regulatory organization charged with the responsibility of investigating or prosecuting such violation or charged with enforcing or implementing the statute or rule, regulation or order issued pursuant thereto.

4. In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

5. To a federal, state, local or foreign governmental authority or foreign securities authority maintaining civil, criminal or other relevant enforcement information or other pertinent information, such as current licenses, if necessary to obtain information relevant to an agency decision concerning the hiring or retention of an employee, the issuance of a security clearance, the letting of a contract, or the issuance of a license, grant or other benefit.

6. To a federal, state, local or foreign governmental authority or foreign securities authority, in response to its request, in connection with the hiring or retention of an employee, the issuance of a security clearance, the reporting of an investigation of an employee, the letting of a contract, or the issuance of a license, grant or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

3

7. In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

8. When considered appropriate, records in this system may be disclosed to a bar association, the American Institute of Certified Public Accountants, a state accountancy board or other federal, state, local or foreign licensing or oversight authority, foreign securities authority, or professional association or self regulatory authority performing similar functions, for possible disciplinary or other action.

9. In connection with investigations or disciplinary proceedings by a state securities regulatory authority, a foreign securities authority, or by a self regulatory organization involving one or more of its members.

10. As a data source for management information for production of summary descriptive statistics and analytical studies in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies, and to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act or to locate specific individuals for personnel research or other personnel management functions.

11. In connection with their regulatory and enforcement responsibilities mandated by the federal securities laws (as defined in Section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), or state or foreign laws regulating securities or other related matters, records may be disclosed to national securities associations that are registered with the Commission, the Municipal Securities Rulemaking Board, the Securities Investor Protection Corporation, the federal banking authorities, including but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation, state securities regulatory or law enforcement agencies or organizations, or regulatory law enforcement agencies of a foreign government, or foreign securities authority.

12. To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in Section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or the Commission's Rules of Practice, 17 CFR 201.100 - 900, or otherwise, where such trustee, receiver, master, special counsel or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice.

13. To any persons during the course of any inquiry or investigation conducted by the Commission's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

14. To any person with whom the Commission contracts to reproduce, by typing, photocopy or other means, any record within this system for use by the Commission and its staff in connection with their official duties or to any person who is utilized by the Commission to perform clerical or stenographic functions relating to the official business of the Commission.

15. Inclusion in reports published by the Commission pursuant to authority granted in the federal securities laws (as defined in Section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)).

16. To members of advisory committees that are created by the Commission or by the Congress to render advice and recommendations to the Commission or to the Congress, to be used solely in connection with their official designated functions.

17. To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 735-18, and who assists in the investigation by the Commission of possible violations of federal securities laws (as defined in Section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

18. Disclosure may be made to a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

19. To respond to inquiries from Members of Congress, the press and the public which relate to specific matters that the Commission has investigated and to matters under the Commission's jurisdiction.

4

20. To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78u(a), as amended.

21. To respond to subpoenas in any litigation or other proceeding.

22. To a trustee in bankruptcy.

23. To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

* * * * *

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you have comments about the SEC's enforcement of the securities laws, please contact the Office of Chief Counsel in the SEC's Division of Enforcement at 202-551-4933 or the SEC's Small Business Ombudsman at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

5

# EXHIBIT D



SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
(202) 736 8000
(202) 736 8711 FAX

BEIJING          NEW YORK
BRUSSELS         PALO ALTO
CHICAGO          SAN FRANCISCO
DALLAS           SHANGHAI
FRANKFURT        SINGAPORE
GENEVA           SYDNEY
HONG KONG        TOKYO
LONDON           WASHINGTON, D.C.
LOS ANGELES

mwarden@sidley.com
(202) 736 8080

FOUNDED 1866

July 8, 2011

**Confidential Pursuant to 17 C.F.R § 200.83
and 28 C.F.R. § 16.8**

**By Email and First-Class Mail**

Lisa Deitch
Assistant Director
Helaine Schwartz
Senior Counsel
United States Securities and Exchange
Commission
Division of Enforcement
100 F Street, N.E.
Mails Stop 5720-B
Washington, D.C.  20549

Re:   In the Matter of Longtop Financial Technologies Limited HO-11698

Dear Ms. Deitch and Ms. Schwartz:

    We are writing on behalf of our client, Deloitte Touche Tohmatsu CPA Ltd. ("DTTC"), in connection with the above-captioned matter.

    On June 15, 2011, within a day of Sidley Austin LLP's retention by DTTC to represent it in connection with Longtop Financial Technologies Limited ("Longtop"), we called the Staff to understand from the Staff's perspective the status and substance of any requests the Staff made to predecessor counsel concerning the subpoena to DTTC dated May 27, 2011 (the "Subpoena"), which had an original return date of June 10, 2011.  The Staff previously had agreed to extend the return date until June 17, 2011.  During our June 15 call, the Staff indicated that it expected either the production of documents or a log of withheld documents by an extended return date, and we agreed that we would speak again on June 17, 2011, to discuss the length of a further possible extension.  Additionally, the Staff asked DTTC to obtain the consent of Patrick Tsang, Charlotte Lu, Paul Siu, and Tony Wang (collectively, the "DTTC Personnel") to appear voluntarily in the United States for on-the-record testimony and to accept subpoenas for such testimony on behalf of such individuals (the "Request for Testimony").  Pursuant to our further

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000008



Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 3

way that is not inconsistent with China law, and it will continue to seek ways to cooperate with
the Staff in doing so.

**1. DTTC's Compliance with the Subpoena.** As contemplated by Congress, DTTC has
complied with the Subpoena as follows. DTTC is a "foreign public accounting firm" as defined
by Section 106(g) of Sarbanes-Oxley because it is an "accounting firm that is organized and
operates under the laws of a foreign government" – the PRC. 15 U.S.C. §7216(g). Because
DTTC is a foreign public accounting firm, any production by it to the SEC is governed by
Section 106 of Sarbanes-Oxley, *id.* at (b) (setting forth the SEC's authority to receive production
of documents from foreign public accounting firms), as amended by the Dodd-Frank Act on July
21, 2010, *see* P.L. 111-203, Title IX, Subtitle B, § 929J, 124 Stat. 1859. Section 106(b) requires
a "foreign public accounting firm" that, *inter alia,* "issues an audit report" or "conducts interim
reviews" to "produce the audit work papers of the foreign public accounting firm and all other
documents of the firm related to any such audit work or interim review to the [SEC] or the
[PCAOB], upon request of the Commission or the Board." *Id.* And Section 106(f) contemplates
that such production obligations can be satisfied by the "alternate means" of production to
"foreign counterparts of the Commission or the Board." *Id.* at (f).

Because DTTC is a foreign public accounting firm, and therefore, any production it
makes to the SEC should be pursuant to Section 106, DTTC stands ready to comply fully with
the Subpoena through the mechanism contemplated by Section 106. As discussed below,
without the consent of the CSRC, DTTC cannot produce documents responsive to the Subpoena
directly to the SEC because such production will violate PRC law and expose DTTC and its
employees to serious civil and criminal liability. Accordingly, to comply fully with the
Subpoena in the face of the China law impediments, and as set forth in Section 106, as
previously communicated to the SEC, DTTC reached out to the CSRC, the SEC and PCAOB's
"foreign counterpart." *Id.* DTTC promptly informed the CSRC of the SEC Subpoena and
requested permission to comply with it through a production of documents in the United States,
but that consent was not provided. *See* Letter from Warden to SEC (June 23, 2011), attaching
letter from DTTC to CSRC (sent June 2, 2011). DTTC then explained to the SEC that DTTC
has no objection to producing documents to the CSRC upon the CSRC's request. Further, by
letter dated July 1, 2011, we informed the SEC (and the CSRC by copy) that DTTC would
welcome the cooperation of the SEC and the CSRC in DTTC's production of documents sought
by the Subpoena. *See* Letter from Warden to SEC (July 1, 2011).

DTTC has gone to substantial additional lengths to be fully prepared to respond to the
Subpoena in a timely fashion. DTTC dispatched personnel from Hong Kong, as well as Sidley
attorneys from our Hong Kong office, to Shanghai to begin an initial review of workpapers and
other documents potentially responsive to the Subpoena. Attorneys have begun reviewing

This document is provided to the U.S. Securities and Exchange Commission solely for its use,
and neither the document nor its contents may be disclosed to any other persons or entities,
pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000010



Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 4

documents and preparing for production – taking the requisite production steps (reviewing, copying, preparing bates stamps, etc.) so that an initial production would be prepared to go to the CSRC immediately upon the CSRC's request, with a rolling production to follow.[1]  DTTC stands ready to make that production.

With this letter, DTTC also is complying with the Subpoena in a second, independent way.  Pursuant to Instruction No. 12 of the Subpoena, the Subpoena provides that DTTC may comply with the Subpoena by identifying and generally describing "all requested documents that [DTTC] do[es] not produce."  SEC Subpoena (A)(12).  In addition to its compliance through Section 106(f), DTTC also has complied with the Subpoena by providing the requested general identification and description of documents that are responsive to the Subpoena, to the extent that they were prepared after the effective date of the Dodd-Frank Act.  While in Shanghai, DTTC personnel and Sidley attorneys prepared the attached log, which "generally describe[s]" the documents not being produced, "the location of each such document and [the] reason for not producing it."  SEC Subpoena (A)(12).

DTTC does object to the Subpoena to the extent it calls for documents beyond what is authorized under Section 106.  Thus, DTTC objects to the Subpoena to the extent it requires production of anything other than "audit work papers . . . and all other documents . . . related to any such audit work."  15 U.S.C. §7216(b).  Consistent with the reasons  Congress amended Section 106, DTTC objects to production of any documents dated prior to the effective date of Section 106, as amended by the Dodd-Frank Act, effective July 21, 2010.

**2. Severe Consequences for Violating PRC's Laws and Sovereignty.**  As contemplated by Congress, DTTC has complied with the Subpoena as authorized by Section 106(f) because the consequences of complying in a different way – *e.g.,* unilaterally removing copies of the documents from Mainland China and producing them in the United States – may be viewed by the Chinese government as being illegal and improper, thus subjecting those who do so to extremely grave consequences, which can include lengthy prison sentences.  For example, in 2010, a Chinese-born American geologist was sentenced to eight years in jail for violating "state secrets" laws by arranging for the sale of an "openly available database about China's

---

[1] We understand that, not unexpectedly, the CSRC would not accept a unilateral production to it (absent a production request or demand made by the CSRC).  For this reason, DTTC has communicated with the CSRC several times and is fully prepared to produce to the CSRC upon request or demand, but has not simply delivered the documents to the CSRC.  In that regard, we understand from media reports that officials from the SEC and the PCAOB will be meeting with CSRC officials next week, and we are hopeful that any such meetings will facilitate DTTC's production of documents to the CSRC that can be shared with the SEC.

**This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.**

DTTC-LT-000011



Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 5

largely state-controlled oil industry" to his U.S. consulting firm.  *See China Jails US Geologist for Stealing State Secrets*, BBC NEWS, July 5, 2010, http://www.bbc.co.uk/news/10505350.  In a similar case, another Chinese-born American was convicted for violating the "state secrets" law for obtaining and using "information about the Chinese steel industry he apparently received while attending a conference" – "seemingly legitimate information . . . obtained from the normal course of business activities."  John Lee, *The Uncurious Case of Xue Feng's Jail Sentence*, FORBES.COM, July 7, 2010, http://www.forbes.com/2010/07/07/xue-feng-stern-hu-state-secrets-opinions-contributors-john-lee.html.  If DTTC were to comply with the Subpoena by producing documents in the United States directly to the SEC without the consent of the CSRC, it would place itself and its personnel at substantial risk of prosecution under PRC criminal law.

As you know, China has laws that place strict controls on the disclosure of "State Secrets," the management of Archives, disclosure and use of personal data ("privacy law"), and places certain duties and restrictions on CPAs.  Regarding the first two categories, on October 20, 2009, the CSRC, the State Secrets Bureau, and the State Archives Bureau together promulgated the Regulations on Strengthening the Protection of Secrets and Archive Management related to Issuance and Listing of Securities Overseas" (the "2009 Directives").  Article 6 of the 2009 Directives expressly covers audit working papers, providing that they must be stored in China and strictly prohibiting their production to people or entities outside of China without express approvals from Chinese authorities.[2]

The laws pertaining to "State Secrets" include far more than what colloquially would be understood to be "state secrets" in the United States.  In China, matters relating to "national economy and social development," as well as other matters relating to "science and technology," can be and have been deemed to be state secrets.  *See, e.g.*, the PRC Maintenance of State Secrets Law, Arts. 2, 3, 9.  This is not limited to documents but includes information, such as would be obtained via testimony from DTTC employees.  *See, e.g.*, the PRC Maintenance of State Secrets Law, Art. 3 (Defining state secrets as, *inter alia*, "*matters* that relate to . . . national interests . . . in the field of . . . economy, . . . etc.") (emphasis added).  The State Secrets Bureau is empowered to determine what constitutes a state secret and may make broad determinations.  *See id.* at Art. 11.  Such determinations can form the basis of a conviction under China law.  The documents and information in DTTC's possession relate, at the very least in a broad sense, to China's national economy.  Further, as Carolyn Bartholomew, the Vice Chairman of the U.S.-

---

[2] Along similar lines, Article 8 of the 2009 Directives requires an audit firm to inform the CSRC of any requests for documents by a foreign regulator.  As we have informed you previously, and as discussed above, DTTC informed the CSRC and the CSRC has declined to consent to production at this time.

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000012



Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 6

China Economic and Security Review Commission put it in her June 30, 2010, testimony to Congress, "basic economic data" can be a "potential state secret." *China's Information Control Practices and the Implications for the United States: Hearing Before the U.S.-China Economic and Security Review Commission*, 111th Congress at 38 (2010).[3] Most recently, the Chinese finance ministry reiterated its policy that Chinese companies use accounting firms capable of protecting national economic information – effectively suggesting that the information available to auditors in fact implicates national interests. Simon Rabinovitch, *China Moves to Improve Accountancy Industry*, FINANCIAL TIMES, June 26, 2011, http://www.ft.com/cms/s/0/1e55ee9a-a067-11e0-a115-00144feabdc0.html#axzz1Qa9UIlK3. DTTC simply is not in a position to decide what documents and information do or do not fall within the law; instead, the law requires the approval of the Chinese government to produce them. 2009 Directives, Art. 6. And this state secrets issue is made more acute as many of Longtop's customers are National banks in the PRC. Given that the CSRC has not consented to DTTC's production of its documents here directly to the SEC, DTTC is not in a position to do so.

Most importantly, the penalties for violating the China State Secrets laws are criminal, PRC Maintenance of State Secrets Law, Art. 48, and of the most serious magnitude. Violators of these laws can be imprisoned for life in China. PRC Criminal Law, Art. 111. This is apparently true even where some of the information disclosed already was in what people in the United States would call the public domain. For example, as we understand it, a reporter went to jail in China for writing an article about facts that *already* had been "widely circulated" in China. *See* New York Times, "Yahoo helped Chinese to prosecute journalist," September 8, 2005, http://www.nytimes.com/2005/09/07/business/worldbusiness/07iht-yahoo.html.

China law also closely controls the management and disclosure of so-called "Archives". Archives include historical records of public organizations and individuals whose preservation is of value to the State. PRC Archives Law, Art. 2. As with "State Secrets," what constitutes an "Archive" under China law is defined very broadly, *see, e.g., id.* at Art. 2 (historical records of value to the state), and controlled by a state agency, here the State Archives Bureau in conjunction with provincial archive authorities, *id.* Under the Archives law it is strictly prohibited to transfer archives outside of China. *Id.* at Arts. 14, 16, and 18. Violation of this law can result in criminal liability. *Id.* at Art. 26.

---

[3] At the same hearings, Gordon C. Chang, a Forbes columnist who has served as a lawyer in China and Hong Kong for almost two decades, opined: "The State Secrets Law, and this is important for us as Americans, affects American business by potentially criminalizing the gathering of *ordinary business information*." *China's Information Control Practices and the Implications for the United States: Hearing Before the U.S.-China Economic and Security Review Commission*, 111th Congress at 76 (2010) (emphasis added).

**This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.**



SIDLEY AUSTIN LLP

Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 7

In addition to the State Secrets law and the Archives law, China law imposes a number of other impediments that are critical here, including the PRC Certified Public Accountants Law and the PRC General Principles of Civil Law and Criminal Law, which cover privacy rights. The PRC Certified Public Accountants Law requires CPAs to keep all "commercial secrets" confidential, which would include information, both documents and testimony, relating to Longtop's business, its customers, and its technologies. PRC CPA Law, Art. 19. Violation of the CPA law results in criminal, administrative, and civil liabilities. *See id.* at Art. 9; PRC Criminal Law Art. 219. It also appears that the obligations of the law cannot be waived through consent of the audit client. The PRC General Principles of Civil Law protect personal rights, including rights of privacy. *See* PRC General Principles of Civil Law Arts. 99, 102, and 120. The law protects citizens and legal persons' personal name, image, reputation, and honor. *See id.* The PRC Criminal Law makes it illegal for any employee in the field of finance to provide personal information, including documents and testimony, about citizens that was obtained during the performance of the employee's duties. Violation may result in a fine and imprisonment up to three years. PRC Criminal Law, Art. 253(A).

The Subpoena implicates each of these impediments. The key point here is that these laws are somewhat vague by United States standards, but they can be – and have been – read by the Chinese government very broadly. The severity of the possible sanctions makes it impossible, absent CSRC consent, for DTTC to produce its documents in the United States and consent to employee testimony at this time without risking prosecution. We respectfully ask that the SEC not place DTTC in this position. Further, it is the stated position of the SEC, and the enacted will of Congress via Section 106(f), to work through the CSRC to obtain the documents and information sought via the current Subpoena in order to comply with domestic China law.

**3. Policy of SEC and CSRC that Investigations of Companies Located in the PRC Be Conducted Cooperatively.** Indeed, United States regulators have acknowledged the impediments at issue and are engaging in efforts to work with the Chinese government as a result. In an April 27, 2011, letter, SEC Chairman Mary Schapiro told Congress that the CSRC views attempts by the SEC to obtain information in the PRC, like the one being made here through the Subpoena, to be potentially unlawful:

> As noted in your letter, there are certain difficulties associated with investigations of securities laws that touch on foreign jurisdictions. The SEC routinely notifies our regulatory counterparts, including the China Securities Regulatory Commission (CSRC), that obtaining voluntary and direct access to witnesses and information is important to our enforcement investigations. In many jurisdictions, the SEC can directly access witnesses and

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000014


SIDLEY AUSTIN LLP

Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 8

information to further its investigations. However, some jurisdictions, such as the PRC, view such direct efforts as a possible violation of sovereignty and/or national interest, which may be expressed informally (as is done by the CSRC) or embodied in law of agreement. In such cases, we generally work with the jurisdiction's home regulator to pursue our enforcement aims, and we continue to press for direct access where foreign law would not prevent it.

Chairman Schapiro's description of the CSRC's position is consistent with the CSRC's own May 15, 2009, letter to the SEC describing the "fundamental challenge" of "PCAOB attempts to take actions on a unilateral basis." In that letter, the CSRC made clear that it is of the view that "the oversight of Chinese accounting firms should fully rely on the work of the CSRC" and that the CSRC is "strongly opposed to PCAOB inspection on any Chinese accounting firm before any consensus has been reached between China and the US."

Accordingly, our hope is that our continuing dialogue can include the SEC working with the CSRC to pursue its enforcement aims, as suggested in Chairman Schapiro's letter of April 27, 2011, and consistent with the memoranda of understanding between the United States and China. Indeed, both the SEC and the PCAOB were recently in the PRC meeting with officials from the CSRC "to discuss cross-border oversight, hoping to sign an agreement on accounting supervision by the end of this year," according to the official Xinhua News Agency.[4] Samuel Shen & Kazunori Takada, *China Mulls Ways to Tackle Accounting Issues: Regulator*, THE CHINA POST, June 28, 2011, http://www.chinapost.com.tw/business/asia/b-china/2011/06/28/307709/China-mulls.html. According to the PCAOB, "progress had been made following a meeting of the PCAOB and the China Securities Regulatory Commission during the recent U.S.-China Strategic and Economic Dialogue. 'Both sides have agreed to accelerate efforts, including undertaking a process for negotiations and engaging in technical assistance activities, to reach a bilateral agreement governing cross-border audit oversight.'" Claire Baldwin & Nanette Byrnes, *Audit Watchdog, SEC Plan Beijing Visit*, REUTERS, July 5, 2011 (quoting Colleen Brennan, PCAOB spokeswoman).

---

[4] This followed up on a speech on May 5, 2011, where PCAOB Chairman James Doty stated that the PCAOB is "engaged in discussions with the Chinese authorities" to resolve the current "impasse," and that the PCAOB "hopes that – over the course of the next several months – significant progress will be made."

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000015



SIDLEY AUSTIN LLP

Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 9

As you know, the issues raised by the Subpoena are not unique to this matter.  Instead,
they relate to the broader dialogue between the United States and China, and we hope that those
issues will be discussed – and resolved – in next week's meetings among the SEC, the PCAOB
and the CSRC.  Our understanding is that representatives from the SEC and PCAOB will be in
Beijing next week to meet with representatives from the CSRC to discuss "giving American
regulators the right to investigate companies within China."  Eva Woo & Dune Lawrence, *China
Discusses Allowing SEC Probes*, BLOOMBERG, July 5, 2011,
http://www.bloomberg.com/news/2011-07-05/china-said-to-discuss-allowing-sec-probes-of-
mainland-firms-for-first-time.html. The PCAOB stated that the purpose of the meetings include
"the commencement of [the PCAOB's] accelerated efforts with the People's Republic of China
to forge a cooperative resolution to cross-border auditing oversight," exchanging information,
and working toward a bilateral agreement on inspections.  PCAOB Press Release, "Statement on
Delegation to China," July 2011,
http://pcaobus.org/News/Releases/Pages/07062011_China.aspx.  At bottom, the potentially
conflicting laws of the U.S. and the PRC are government-to-government issues that can only be
resolved at that level, not through a specific investigation or subpoena.  We are hopeful that such
meetings will allow the SEC and CSRC to reach an arrangement that will facilitate DTTC's
ongoing cooperation and the SEC's obtaining information for its investigation.

Such an arrangement would be consistent with prior agreements by the SEC and CSRC.
As the SEC previously expressed in its "Terms of Reference For Cooperation and Collaboration"
with the CSRC, "the CSRC and SEC will work to communicate quickly on [securities fraud]
matters and to provide timely and thorough assistance to one another, *consistent with domestic
laws*." SEC, "Terms of Reference For Cooperation and Collaboration",
http://www.sec.gov/about/offices/oia/oia_bilateral/chinator.pdf (emphasis added); *see also* SEC
Press Release, May 2, 2006, http://www.sec.gov/news/press/2006/2006-63.htm.  The SEC has
further underscored this policy by signing the Multilateral Memorandum of Understanding
Concerning Consultation and Cooperation and the Exchange of Information with the CSRC
("MMoU").  The MMoU, organized by the International Organization of Securities
Commissions, sets forth that the SEC and CSRC, as signatories, will "provide each other with
the fullest assistance permissible to secure compliance with the respective Laws and
Regulations" of the SEC and CSRC.  MMoU(7)(a), *available at*
http://www.iosco.org/library/pubdocs/pdf/IOSCOPD126.pdf.  The agreed upon assistance
includes providing "information and documents" by the CSRC to the SEC and individual
"testimony." *Id.* at (7)(b)(i)-(iii).

Specific to this case, the CSRC has made it clear that it does not consent at this time to
the SEC's direct efforts to obtain information from DTTC through the Subpoena.  On June 2,
2011, DTTC sought approval from the CSRC to respond to the Subpoena. *See* Letter from

This document is provided to the U.S. Securities and Exchange Commission solely for its use,
and neither the document nor its contents may be disclosed to any other persons or entities,
pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000016



SIDLEY AUSTIN LLP

Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 10

Warden to SEC (June 23, 2011), attaching letter from DTTC to CSRC (sent June 2, 2011). The
CSRC did not consent, and instead directed DTTC to seek approval from the Ministry of Finance
and the State Secrets Bureau and the State Archives Bureau, as appropriate. DTTC has sought
those approvals, but those PRC agencies have not provided them. Accordingly, a direct
production of documents to the SEC at this time would be in contradiction both to the CSRC's
general position (as articulated by Chairman Schapiro and in the CSRC's own 2009 letter to the
SEC), as well as the CSRC's specific position concerning this Subpoena. DTTC, although a
member of a global network, is wholly based in China and the CSRC is its primary local
regulator. All of the relevant documents in this case are physically in China and concern
businesses in China. DTTC simply cannot unilaterally go against the CSRC's directive,
especially where, as here, Congress has specifically set forth an alternative means of compliance
and DTTC has offered to produce documents to the CSRC.

    Our hope is that the SEC can work with the CSRC pursuant to the memoranda of
understanding between China and the United States. As DTTC previously has told the Staff,
DTTC will not object to the CSRC making such documents available to the SEC. In previous
telephone calls, you expressed a desire for us to inform the Staff of such a production, which we
also have agreed to do. The Staff also expressed some frustration that the CSRC in the past has
been unwilling to provide the SEC with audit working papers requested by the SEC. Although
we understand that frustration, the CSRC's position in those matters underscores the point that
the Chinese government may take a very dim view of *any* production – even by Chinese
regulators – of audit workpapers and other documents directly to the SEC. And DTTC cannot
responsibly take steps that could expose itself and its employees to draconian sanctions –
including prison time.

    With respect to the Staff's oral request that DTTC prepare something akin to a privilege
log in short order, we do not think it would enhance either our mutual understanding of the issues
at play or, more significantly, the potential resolution of those issues. There are logistical
barriers and burden issues associated with reviewing all of the documents potentially at issue
and, as you know, detailed "privilege logs" of full sets of working papers can take weeks or
months to complete even under the best of circumstances, which these are not. Moreover, there
are fundamental issues at stake – that DTTC cannot produce any of these documents in the
United States without risking the imprisonment of its employees. A "privilege log" will not
bring DTTC and the Staff any closer to a resolution of that issue, and requiring such a log would
be unduly burdensome. Finally, just to be clear as a technical matter, DTTC is not withholding
these documents on the basis of a privilege, and we do not believe there is authority for requiring

This document is provided to the U.S. Securities and Exchange Commission solely for its use,
and neither the document nor its contents may be disclosed to any other persons or entities,
pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000017



Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 11

a specific log of documents when a categorical foreign legal impediment is being asserted.[5]
Accordingly, to the extent the Staff has made that request orally, we object to it. Instead, as
discussed above, we will comply with Instruction No. 12 of the Subpoena, identifying and
generally describing the documents DTTC is not producing, their location, and DTTC's reason
for not doing so. Those descriptions, by category, are attached to this letter.

    **4. DTTC Has Acted Professionally, Appropriately and in Compliance with the
Securities Laws and SEC Regulations.** DTTC takes seriously its responsibilities as an auditor,
including to the investing public, regardless of where its clients' securities are registered. And,
with respect to U.S. issuers, such as Longtop, DTTC is committed to compliance with the U.S.
securities laws and SEC regulations. In fact, DTTC's adherence to those very responsibilities
served as the catalyst to the current SEC investigation. In the course of conducting its audit of
Longtop's financial statements for the year ended March 31, 2011, DTTC became aware of
certain irregularities. DTTC appropriately performed follow up audit steps regarding previously
received bank confirmations. *See* DTTC Resignation Letter (May 22, 2011) (App. A). During a
DTTC visit to the bank from which the Longtop confirmations were received, bank staff made
statements that their bank had no record of certain transactions, that previously received
conformations were false, that there were significant differences in deposit amounts from those
previously received confirmations, and that there were significant amounts of bank borrowings
not reported in previously received confirmations. *Id.* (App. A).

    Based on these statements, DTTC promptly initiated a formal second round of bank
confirmation on May 17, 2011. *Id.* (App. A). Longtop, however, did not allow DTTC to
perform the second round of work. Instead, within hours of DTTC's attempt to begin this work,
Longtop officials, including the Chief Operating Officer, intervened, the work was stopped, and
Longtop seized certain of DTTC's audit files. *Id.* (App. A). On May 20, the Chairman of
Longtop called DTTC and stated during the course of the call that there was fake revenue
reported in the past, so there was fake cash recorded on the books. *Id.* (App. A).

    DTTC acted swiftly, cognizant of its responsibilities under Section 10A of Securities
Exchange Act, pursuant to applicable professional standards, and to the investing public. Indeed,
in that regard, it is hard to imagine a more noisy withdrawal than DTTC's resignation from
Longtop. After discussions with Longtop's Audit Committee on May 17 and 18, DTTC sent two
letters to Longtop's Audit Committee dated May 22. *See* DTTC Resignation Letter (May 22,
2011) (App. A); DTTC 10A Letter (May 22, 2011) (App. B). The letters informed Longtop's
Audit Committee that DTTC was resigning as its auditor because of (1) the recently identified

---

[5] DTTC may assert privilege over any of these documents that fall within any privileged
categories—something DTTC will not know until it has the opportunity to complete its review.

**This document is provided to the U.S. Securities and Exchange Commission solely for its use,
and neither the document nor its contents may be disclosed to any other persons or entities,
pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.**



Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 12

falsity of Longtop's financial records in relation to cash at bank, loan balances, and sales revenue; (2) the deliberate interference by Longtop's management in DTTC's audit process; and (3) the unlawful detention of DTTC's audit files.  DTTC Resignation Letter (May 22, 2011) (App. A).  DTTC also asked Longtop to inform the SEC of these developments by making the appropriate 6K filing and consented to a copy of its resignation letter being produced to the SEC. *Id.* (App. A).

Moreover, the resignation letter specifically noted that "the circumstances [described in the resignation letter] could constitute illegal acts for purposes of Section 10A of the Securities Exchange Act of 1934" and "remind[ed] the Board of its obligations under Section 10A of the Securities Exchange Act, including the notice requirements to the U.S. Securities and Exchange Commission." *Id.* (App. A).  And, in a separate May 22, 2011 letter to the Audit Committee, DTTC emphasized that its "resignation does not end the question of whether some forensic or other investigation should be undertaken, including as may be appropriate in connection with Section 10A of the Securities Exchange Act of 1934." DTTC 10A Letter (May 22, 2011) (App. A).  Those letters resulted directly in the Audit Committee's retention of U.S. legal counsel to conduct the very forensic investigation suggested by DTTC's letters.

Importantly, Longtop's wrongful conduct has created at least one unique issue with respect to DTTC documents—those documents that otherwise would be responsive to the Subpoena but are no longer under DTTC's control because they have been unlawfully obtained by Longtop.  As you know, we have demanded the return of those documents, and have been negotiating for their return until recently with Jones Day, whom we understood to represent Longtop's audit committee.  We now understand that the Staff issued a subpoena to Jones Day itself for those documents.  The only reason why there is a distinct issue concerning the documents now in Longtop's possession (or Jones Day's possession) is because Longtop unlawfully obtained DTTC's property.  Longtop was able to unlawfully obtain these documents only by threatening DTTC personnel with detention if DTTC refused to leave its workpapers on site when DTTC resigned.  These events are particularly troubling given that all of these actions occurred after DTTC attempted to perform follow-up audit procedures only to be thwarted by management interference.  Additionally, these documents are no longer within DTTC's possession or control because of Longtop's wrongful actions.  As such, DTTC is currently unable to produce these documents.  However, DTTC will continue to attempt to regain control of its files (or at a minimum a copy thereof) and, if it is successful in doing so, intends to treat such documents similarly to the documents that remain under its control and produce them pursuant to Section 106.

At every turn, DTTC has acted appropriately and consistent with U.S. securities laws, and it continues to do so.  DTTC is committing to cooperating with the SEC's investigation.  As

**This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.**

DTTC-LT-000019


SIDLEY AUSTIN LLP

Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 13

we have discussed, however, because of the impediments placed here by China law, DTTC must comply with the Subpoena through Section 106(f), as well as the independent production of the attached set of general descriptions. We look forward to continuing our dialogue with the Staff to attempt to address these difficult issues.

*       *       *

This correspondence is not intended to, and does not, waive any applicable privilege or protection, including the attorney-client privilege or work-product protection. On behalf of our client, we hereby claim that all materials provided to the Commission during the course of its investigation, including this letter, are entitled to confidential treatment. This request for confidentiality shall continue indefinitely unless we advise you otherwise. Because such documents constitute investigatory records obtained by the Commission in connection with a potential law enforcement proceeding, they certainly are subject, at least at the present, to the exemption from mandatory disclosure under Exemption 7(A) of the Freedom of Information Act, 5 U.S.C. § 552(b)(7)(A) (1975). *See, e.g., National Labor Relations Board v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978); *Chilivis v. Securities and Exchange Commission*, 673 F.2d 1205 (11th Cir. 1982). In addition, we believe that Exemptions 4, 6, 7(B) and 7(C) of the Freedom of Information Act, 5 U.S.C. §§ 552(b)(4), (b)(6), (b)(7)(C) are also applicable to the documents, as well as the protections available under the Privacy Act of 1974, 5 U.S.C. § 552a.

Accordingly, we expect that all documents and copies of documents produced in connection with the Commission's investigation, including this letter, will be kept in a non-public file and that access to them by any third party not a member of the Commission or its staff will be denied. Should the Commission receive any request for these documents, either pursuant to the Freedom of Information Act or otherwise, we expect that we will be given an opportunity to object to such disclosure. Furthermore, should the Commission be inclined to disclose these documents to any third party, it is our expectation that, in accordance with normal Commission practice, we will be given ten (10) business days' advance notice of any such decision to enable our client to pursue any remedies that may be available. *See, e.g., Chrysler Corp. v. Brown*, 441 U.S. 281 (1979). In such event, we request that the Commission telephone the undersigned rather than rely upon the United States mail for such notice. We request that the Commission also provide a written copy of such notice to our client, addressed as follows: Deloitte Touche Tohmatsu CPA Ltd., 30/F Bund Center, 22 Yan An Road East, Shanghai 200002, PRC, Attention: Chris Lu. Our request that the Commission provide a written copy of such notice to our client does not constitute authorization for the Commission to provide such notice to our client in lieu of us.

The requests set forth in the preceding paragraphs also apply to any memoranda, notes, transcripts, or other writings of any sort that are created by, or at the request of, an employee of

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000020



Lisa Deitch
Helaine Schwartz
July 8, 2011
Page 14

the Commission and that (i) incorporate, include, or relate to any confidential materials or (ii) refer to any conference, meeting, or telephone conversation between employees of the Commission and DTTC, its employees, counsel, or other representatives, relating to confidential materials.

All confidential materials remain the property of DTTC. We therefore request that upon the conclusion of the Commission's investigation, this letter, all enclosures, and any copies made thereof, be returned to the undersigned as soon as possible.

Please call me at (202) 736-8080 or Dave Gordon at (312) 853-7159 if you have any questions.

Very truly yours,

Michael D. Warden /ze

Michael D. Warden

cc:     Gary Bendinger
        David Gordon

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000021

  
Documents listed below are audit working papers and other files prepared after the effective date of Dodd-Frank withheld pursuant to correspondence dated July 8, 2011.

| File Number | File Descriptions | Where is This File Stored? | Approximate Number Of Sheets in The File or Size of the File (*) | File Format* | Reasons for withholding |
|---|---|---|---|---|---|
| | **Audit/Review Working Files (Up to Fiscal 2011 Q3 Review)** | | | | |
| 1 | Longtop current file for the period ended 30.06.2011 | DTTC Office, Shanghai | 110 | Hard Copy | Directives, SS, Criminal, Archive, CPA, Privacy |
| 2 | Longtop current file for the period ended 30.09.2011 | DTTC Office, Shanghai | 140 | Hard Copy | Directives, SS, Criminal, Archive, CPA, Privacy |
| 3 | Longtop current file for the period ended 31.12.2011 | DTTC Office, Shanghai | 60 | Hard Copy | Directives, SS, Criminal, Archive, CPA, Privacy |
| 4 | LFT audit working papers for 2011 quarter 1 | DTTC Office, Shanghai | 17,117KB | Electronic - AS2 File | Directives, SS, Criminal, Archive, CPA, Privacy |
| 5 | LFT audit working papers for the 3 months ended 30.09.2010 | DTTC Office, Shanghai | 26,047KB | Electronic - AS2 File | Directives, SS, Criminal, Archive, CPA, Privacy |
| 6 | LFT audit working papers for the 3 months ended 31.12.2010 | DTTC Office, Shanghai | 16,284KB | Elecronic - AS2 File | Directives, SS, Criminal, Archive, CPA, Privacy |
| | **FAS** | | | | |
| 7 | ZBK purchase price allocation workings 08.2010 | DTTC Office, Shanghai | 50 | Hard Copy | Directives, SS, Criminal, Archive, CPA, Privacy |
| 8 | Iboss and HDY and Infopower purchase price allocation 09.2010 | DTTC Office, Shanghai | 250 | Hard Copy | Directives, SS, Criminal, Archive, CPA, Privacy |
| | **Uncompleted Audit Working Files for Fiscal 2011 Audit** | | | | |
| 9 | Longtop current file for the financial year 2011 (AS2 series 1000 to 3000 - planning, reporting and audit management)* | DTTC Office, Shanghai | 270 | Hard Copy | Directives, SS, Criminal, Archive, CPA, Privacy |

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000024

**Reason for Withholding**

| | |
|---|---|
| Directives | Regulations on Strengthening the Protection of Secrets and Archive Management related to Issuance and Listing of Securities Overseas (2009 Directives) |
| SS | PRC Maintenance of State Secrets Law |
| Criminal | PRC Criminal Law |
| Archive | PRC Archive Law |
| CPA | PRC Certified Public Accountants Law |
| Privacy | PRC General Principles of Civil Law and Criminal Law (related to privacy) |
| Burden | Undue burden at this time |

**Notes:**

For manual files, randomly selected files as benchmark, counted the actual number of sheets and measured thickness of each file. This average thickness was used as a benchmark for estimation of the number of sheets for the remaining manual files.

For electronic files (AS2), recorded the electronic size of each AS2 backup file. The actual size may be larger when the backup file is restored. Each AS2 file includes the following sections:  series 1000 (planning), series 2000 (reporting), series 3000 (audit management), series 4000 (controls), series 5000 (substantive testing – assets), series 6000 (substantive testing – liabilities), series 7000 (substantive testing - equity), and series 8000 (substantive testing - income statement)

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

# APPENDIX A

**This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.**

DTTC-LT-000025

# Deloitte.
## 德勤。

| | |
|---|---|
| 德勤华永会计师事务所有限公司 | Deloitte Touche Tohmatsu CPA Ltd. |
| 中国上海市延安东路222号 | 30/F Bund Center |
| 外滩中心30座 | 222 Yan An Road East |
| 邮政编码 : 200002 | Shanghai 200002, PRC |
| 电话 : +86 21 6141 8888 | Tel: +86 21 6141 8888 |
| 传真 : +86 21 6335 0003 | Fax: +86 21 6335 0003 |
| www.deloitte.com/cn | www.deloitte.com/cn |

22 May 2011

**BY EMAIL & BY REGISTERED MAIL**

The Audit Committee
Longtop Financial Technologies Limited
No. 61 Wanghai Road, Xiamen Software Park
Xiamen, Fujian Province
People's Republic of China

Attention: Mr. Thomas Gurnee, Chairman of the Audit Committee

Dear Sirs,

**Longtop Financial Technologies Limited (the "Company") and together with its subsidiaries (the "Group")**
**Audit for the Year Ended 31 March 2011**

We hereby give you formal notice of our resignation as auditor of the Company.

**Background and significant issues encountered by Deloitte Touche Tohmatsu CPA Ltd. (China) ("Deloitte")**

As part of the process for auditing the Company's financial statements for the year ended 31 March 2011, we determined that, in regard to bank confirmations, it was appropriate to perform follow up visits to certain banks. These audit steps were recently performed and identified a number of very serious defects including: statements by bank staff that their bank had no record of certain transactions; confirmation replies previously received were said to be false; significant differences in deposit balances reported by the bank staff compared with the amounts identified in previously received confirmations (and in the books and records of the Group); and significant bank borrowings reported by bank staff not identified in previously received confirmations (and not recorded in the books and records of the Group).

In the light of this, a formal second round of bank confirmation was initiated on 17 May. Within hours however, as a result of intervention by the Company's officials including the Chief Operating Officer, the confirmation process was stopped amid serious and troubling new developments including: calls to banks by the Company asserting that Deloitte was not their auditor; seizure by the Company's staff of second round bank confirmation documentation on bank premises; threats to stop our staff leaving the Company premises unless they allowed the Company to retain our audit files then on the premises; and then seizure by the Company of certain of our working papers.

Member of Deloitte Touche Tohmatsu

This is printed on environmentally friendly paper
这是环保纸印刷品

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000026

**Deloitte.**
德勤

| 德勤华永会计师事务所有限公司 | Deloitte Touche Tohmatsu CPA Ltd. |

德勤华永会计师事务所有限公司
中国上海市延安东路222号
外滩中心30层
邮政编码 : 200002
电话 : +86 21 6141 8888
传真 : +86 21 6335 0003
www.deloitte.com/cn

Deloitte Touche Tohmatsu CPA Ltd.
30/F Bund Center
222 Yan An Road East
Shanghai 200002, PRC
Tel: +86 21 6141 8888
Fax: +86 21 6335 0003
www.deloitte.com/cn

22 May 2011

**BY EMAIL & BY REGISTERED MAIL**

The Audit Committee
Longtop Financial Technologies Limited
No. 61 Wanghai Road, Xiamen Software Park
Xiamen, Fujian Province
People's Republic of China

Attention:      Mr. Thomas Gurnee, Chairman of the Audit Committee

Dear Sirs,

**Longtop Financial Technologies Limited (the "Company")**
**Audit for the Year Ended 31 March 2011**

Over the two days of 17 and 18 May 2011, our audit partners had been in conversations with Mr. Gurnee, your Chairman, and Professors Shen and Xue, to update you on developments encountered in our audit in the context of our responsibilities under Statement on Auditing Standards No. 99 "Consideration of Fraud in a Financial Statement Audit" issued by the American Institute of Certified Public Accountants.

We now have to inform you that events have moved on in a very serious way; indeed so serious that we have come to a decision that our immediate resignation from the audit is called for, as described further in our formal resignation letter.

Our resignation does not end the question of whether some forensic or other investigation should be undertaken, including as may be appropriate in connection with Section 10A of the Securities Exchange Act of 1934. This is a matter within your own province and you may consider taking legal advice in this regard.

We attach our formal resignation letter and draw your attention especially to the conversation between our Eastern Region Managing Partner, Mr. Paul Siu and the Company's Chairman, Mr. Jia, referred to in the fifth paragraph of our attached resignation letter.

Yours faithfully,

*Deloitte Touche Tohmatsu CPA Ltd.*

Member of Deloitte Touche Tohmatsu

This is printed on environmentally friendly paper
这是环保纸印制品

This document is provided to the U.S. Securities and Exchange Commission solely for its use, and neither the document nor its contents may be disclosed to any other persons or entities, pursuant to a claim of confidentiality made by Deloitte Touche Tohmatsu CPA Ltd.

DTTC-LT-000030